**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA GARRETT, Individually and as Administrator of the Estate of Nathan Alexander Garrett, Deceased** | ) ) ) | **Case No.  1:23-CV-02011-PAB** |
| 106 Squires Lane | ) | |
| Chardon, Ohio 44024 | ) | |
| | ) | **JUDGE PAMELA A. BARKER** |
| **Plaintiff,** | ) ) | |
| | ) | |
| **vs.** | ) ) | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| **MORGAN COUNTY SHERIFF'S OFFICE** | ) ) | |
| 37 East Main Street #1 | ) | |
| McConnelsville, Ohio 43756 | ) | **Jury Demand Endorsed Hereon** |
| | ) | |
| -and- | ) | |
| | ) | |
| **MORGAN COUNTY BOARD OF COUNTY COMMISIONERS** | ) ) | |
| 155 East Main Street | ) | |
| McConnelsville, Ohio 43756 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| **DOUGLAS J. MCGRATH, Individually and in his official capacity as Sheriff of Morgan County** | ) ) ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| **ALEX MAYLE, Individually and in his official capacity as a Deputy of the Morgan County Sheriff's Office** | ) ) ) | |
| | ) | |
| -and- | ) | |
| | ) | |

**THOMAS JENKINS, JR., Individually and in his official capacity as a Deputy of the Morgan County Sheriff's Office**           )
)
)
)

-and-           )
)

**OHIO NATIONAL GUARD**           )
**c/o MAJOR GENERAL JOHN C.**           )
**HARRIS, JR.**           )
2825 West Dublin Granville Rd.           )
Columbus, Ohio 43235           )
)

-and-           )
)

**JACK GILLUM, Individually and in his official capacity as First Sergeant of the Ohio National Guard, 174th Air Artillery Brigade in McConnelsville, Ohio**           )
)
)
)

-and-           )
)

**ANGELA WILKER, Individually and in her capacity as a Captain in the Ohio National Guard, 174th Air Artillery Brigade in McConnelsville, Ohio**           )
)
)
)

-and-           )
)

**LAWRENCE BOGAN, Individually and in his capacity as a Commanding Officer in the Ohio National Guard 174th Air Artillery Brigade in McConnelsville, Ohio**           )
)
)
)
)

-and-           )
)

**CRUZ D. ALLEN**           )
9826 Tamarack Trail           )
Brecksville, Ohio 44141           )
)

-and-           )
)

**TRANCE M. VAN LIERE**           )
6630 Bellflower Ct.           )
Curtice, Ohio 43412           )
)

2

-and-                                              )
                                                   )
**THOMAS DEVELIN**                                 )
Inmate No. 08421-510                               )
FCI Elkton                                         )
8730 Scroggs Road                                  )
Lisbon, Ohio 44432                                 )
                                                   )
-and-                                              )
                                                   )
**JAMES R. MEADE**                                 )
3220 Goshun Run Road                               )
Chesterhill, Ohio 43728                            )
                                                   )
-and-                                              )
                                                   )
**CHRISTOPHER LEACH**                              )
106 Quail Creek Dr.                                )
Gallipolis, Ohio 45631                             )
                                                   )
-and-                                              )
                                                   )
**JORDAN C. HAAS**                                 )
7324 Thatcher Avenue NW                            )
North Canton, Ohio 44720                           )
                                                   )
-and-                                              )
                                                   )
**BRENNA M. NYE**                                  )
22411 W. Red Clover Ln.                            )
Curtice, Ohio 43412                                )
                                                   )
-and-                                              )
                                                   )
**JOHN DOE #1 (Identity Unknown)**                 )
Address Unknown                                    )
                                                   )
-and-                                              )
                                                   )
**JOHN DOE #2 (Identity Unknown)**                 )
Address Unknown                                    )
                                                   )
-and-                                              )
                                                   )
**JOHN DOE #3 (Identity Unknown)**                 )
Address Unknown                                    )

3

|  |  |  |
|---|---|---|
| -and- | ) | |
| | ) | |
| **JOHN DOE #4 (Identity Unknown)** | ) | |
| Address Unknown | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Now comes the Plaintiff, Lisa Garrett, Individually and as Administrator of the Estate of Nathan Alexander Garrett, deceased, with this action being previously commenced by the filing of the original Complaint on or about October 13, 2023, and with leave being granted, for her First Amended Complaint states as follows:

## THE PARTIES

1.    Lisa Garrett is the duly appointed and acting Administrator of the Estate of Nathan Alexander Garrett ("Mr. Garrett"), deceased, and brings this action for the benefit of herself, her family and her son's Estate and for his heirs and next of kin pursuant to the Ohio Wrongful Death Statute as set forth in Ohio Revised Code sections 2125.01 et seq.

2.    Defendant Morgan County Sheriff's Office ("MCSO") is and was, at all times relevant herein, a State of Ohio political subdivision law enforcement agency situated in McConnelsville, Morgan County, Ohio.

3.    Defendant Morgan County Board of County Commissioners (the "Board") is and was, at all times relevant herein, a political subdivision agency of the State of Ohio comprised of elected officials collectively charged with administering the county government of Morgan County, Ohio, and the body-politic overseeing and controlling the MCSO.

4.    Defendant Douglas J. McGrath ("McGrath") is and was, at all times relevant herein, an individual residing within Morgan County, Ohio, employed as the Sheriff of the MCSO.

5.      Defendant Alex Mayle ("Deputy Mayle") is and was, at all times relevant herein, an individual residing within Morgan County, Ohio, employed as a Deputy Sheriff with the MCSO.  At the time of the filing of this action, Deputy Mayle had resigned from the MCSO and upon information and belief, now serves as a Deputy with the Perry County Sheriff's Office.

6.      Defendant Thomas Jenkins Jr. ("Jenkins") is and was, at all times relevant herein, an individual residing within Morgan County, Ohio, employed as Deputy Sheriff (Sergeant) with the MCSO.  At the time of the filing of this action, Jenkins had resigned from the MCSO to become the Chief of the McConnelsville Police Department. (MCSO, the Board, McGrath, Mayle and Jenkins are referred to collectively throughout as the "Morgan County Defendants.").

7.      Defendant Ohio National Guard ("ONG") is and was, at all times relevant herein, an agency of the State of Ohio, the administration of which is the responsibility of Major General Harris.  The ONG also serves, when properly designated, a reserve component of the U.S. Military consisting of a variety of combat, combat support, and combat service support units headquartered in Columbus, Ohio.  Major General John C. Harris, Jr. is responsible for the command of the ONG and supervises the day-to-day operations and management of the readiness, fiscal, personnel, equipment and real property resources of the ONG.  The soldiers named below are/were members of the ONG 2nd Battalion, 174th Air Artillery Defense Brigade (AAD) located on Hawk Drive in McConnelsville, Ohio.

8.      Defendant Jack Gillum ("Gillum") is and was, at all times relevant herein, an individual residing in Morgan County and the ONG First Sergeant of the AAD.  At the time of the filing of this action, Gillum was removed from the AAD and re-assigned to other duties within the ONG.

9.    Defendant Angela Wilker ("Wilker") is and was, at all times relevant herein, an individual residing in Morgan County and the ONG Captain of the AAD. At the time of the filing of this action, Wilker was removed from the AAD and re-assigned to other duties within the ONG.

10.    Defendant Lawrence Bogan ("Bogan") is and was, at all times relevant herein, an individual residing in Morgan County and the ONG Commanding Officer of the AAD (ONG, Harris, Wilker, and Bogan are collectively referred to throughout as the "ONG Defendants").

11.    Defendant Cruz D. Allen ("Allen") is and was, at all times relevant herein, an individual residing in Brecksville, Cuyahoga County, Ohio.

12.    Defendant Trance M. Van Liere ("Van Liere") is and was, at all times relevant herein, an individual residing in Curtice, Ottawa County, Ohio.

13.    Defendant Thomas Develin ("Develin"), at the time of the subject incident, is an individual and was formerly residing in Columbus, Franklin County, Ohio. Develin was formerly a member of the ONG AAD with a rank of Sergeant – the only supervisory level member of the ONG at the premises on the night in question. Develin is currently serving a seventy-one (71) month prison sentence at FCI Elkton for violations of federal law by, *inter alia,* making terroristic threats, manufacturing and selling "ghost guns" and firearm components to convert single shot rifles into fully automatic machine guns. The charges stem from facts uncovered and reported to federal law enforcement by Plaintiff while investigating the incident giving rise to this Complaint.

14.    Defendant James R. Meade ("Meade") is and was, at all times relevant herein, an individual residing in Chesterhill, Morgan County, Ohio.

15.    Defendant Christopher Leach ("Leach") is and was, at all times relevant herein, an individual residing in Gallipolis, Gallia County, Ohio.

16.     Defendant Jordan C. Haas ("Haas") is and was, at all times relevant herein, an individual residing in North Canton, Stark County, Ohio. As off-duty members of the ONG AAD at the time of the shooting referenced herein, Allen, Van Liere, Develin, Meade, Leach, and Haas are collectively referred to throughout as the "Guardsman Defendants").

17.     Defendant Brenna M. Nye ("Nye") is and was, at all times relevant herein, an individual residing in Curtice, Ottawa County, Ohio.

18.     John Doe #1 through 4 are persons whose identities and locations are currently unknown to Plaintiff and subject to the claims herein.  Through the progress of this action one or more of these parties may become known and then identified.

## JURISDICTION AND VENUE

19.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

20.     Jurisdiction is proper in this Court as this Complaint contains claims for violations of 42 U.S.C. § 1983 and supplemental state law claims properly before this Court pursuant to 28 U.S.C. § 1367.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Defendant Allen is a resident of the Northern District of Ohio, Eastern Division, and all Defendants reside within the State of Ohio.

## OPERATIVE FACTS

22.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

23.     On October 20, 2021, the date giving rise to the incident described herein, Nathan Alexander Garrett was a twenty-one (21) year old male who resided in Chardon, Geauga County,

7

Ohio.  Garrett was also a proud member of the ONG AAD, whose primary occupation was a range safety officer at Point Blank Range & Gun Shop in Mentor, Ohio, and a beloved son and brother.

24.    On said date, Mr. Garrett and the Guardsman Defendants were generally present in McConnelsville, Morgan County, Ohio, under orders from the ONG for extended basic training – also known as "drill" – from Tuesday, October 19 through Sunday, October 24.  The ONG is an agency of the State of Ohio.  Its employees, members and soldiers are employees and agents of the State of Ohio – unless determined otherwise by the Federal Government as set forth in subsequent claims herein.

25.    The particular crew that the Guardsman Defendants (and Nathan Garrett) were part of is the missile artillery unit "Bravo Battery."  There are two components of each of the four batteries at the 174th, a mobile radar unit, and a mobile missile unit.  In Bravo Battery, the radar unit's code name was "Golf", and the missile unit's "Sierra."  Garrett and the other six soldiers at the Cabin that night were all assigned to the Golf radar unit.

26.    The soldiers (except for Van Liere) were released from drill around 5:30 p.m. that day and given permission to spend the evening socializing at an off-base residence as they had done on multiple occasions in the past.  Van Liere was earlier granted leave to be off the entire day to attend a funeral.  Mr. Garrett, along with Allen, Develin, Meade, Leach, and Haas then traveled in separate private vehicles off the AAD base to a private residence ("the Cabin") which was owned by Betty Green (Meade's grandmother) and where Meade resided when not on base. The unit of guardsmen were planning on an evening of drinking and discharging handguns, as they had engaged in on many occasions in the past, even though Cruz Allen was not of legal age to purchase or consume alcoholic beverages.

27.     During the remaining daylight hours on October 20, 2021, a group of the soldiers, including but not limited to Allen, Develin, and Leach were shooting handguns guns from the porch of the Cabin into a hill in the distance on the Property. At some point in the afternoon or early evening hours, Green stopped by to see the boys and witnessed them shooting and drinking alcohol.

28.     As the daylight faded and evening turned to night, the boys moved inside the cabin and continued to drink alcohol and socialize. Van Liere and Nye later arrived at the Cabin between 10:00 and 11:00 p.m. Van Liere was highly intoxicated upon his arrival.  Brenna Nye was purportedly not intoxicated upon arrival, but despite being, like Cruz Allen, under the legal drinking age, began consuming alcoholic beverages for the rest of the evening.

29.     As the evening progressed, the group made their way to the kitchen table telling stories and drinking alcohol.  Along with the spirits and beer, on the table were handguns owned by Leach and Develin, and an air gun ("BB Gun") that was Meade's.  Leach's weapon was a Ruger 9mm semi-automatic pistol that he had recently purchased.  Develin had brought a Glock 19 9mm for which it is believed he possessed a concealed weapons permit, a .40 caliber Sig 420 handgun owned by Develin, and several rifles owned by Meade were also located in various areas around the Cabin.

30.     In that Leach was the newest gun owner, and based upon the various differences and features between the weapons, the discussion at the table drifted towards firearm preferences and the manner by which the weapons were loaded and broken down.  As Leach and Develin discussed and demonstrated the unique and different components of the three handguns, they began to remove the magazines, pull back on the slides, reinsert empty magazines, close the slide

and pull the trigger to achieve what is known as a "dry fire" with what should be an unloaded weapon.

31.     At this point, the circumstances transformed from what could be characterized as an informational discussion among gun enthusiasts, to a disturbing and dangerous variation of the "game" known as Russian Roulette.  Instead of safely dry firing the weapons in a safe direction (such as the floor), those around the table began to pass a gun from one person to another.  When it was handed-off, the recipient would eject the magazine, pull the slide back to purportedly verify the gun was not loaded, replace the empty magazine, and cause the slide to return to position resulting in what is supposed to be an unloaded, but charged weapon.  The person would then take the firearm, point it at their temple, and while consuming more alcohol, dry fire the trigger resulting in the "click" of the firing pin.

32.     Sergeant Develin (the lone supervisory ranked soldier at the Cabin) described this practice to MCSO Deputy Alex Mayle in his interview the following morning as evoking a thrill from the power of the weapon as one pulls the trigger, offset by the relief when the result is simply a "click."  Develin's words were that it "makes you feel more alive" as if it were part of some team-building exercise.  None of the Guardsman Defendants advised Deputy Mayle that evening that anything like this took place.  The next day, some of them dramatically changed their initial statements after spending the night segregated on at the AAD base.  The following morning, they explained that they had been performing this "careless" ritual on a regular basis all year long at Meade's Cabin.  Also referred to as "tactical re-loads", the next day the Guardsmen Defendants explained to Deputy Mayle that it began as the extension of a training exercise to practice rapidly reloading the weapons.

33.     As Mayle also discovered from his interviews the next day, the dry-fires would not be just to the individual's own temple, but this dangerous ritual would also involve aiming and dry-firing at objects within the Cabin (a dart board) as well as pointing and firing at each other. There even was a previous "misfire" the prior year when one of the Guardsman Defendants shot a live round through the floor when the weapon was believed to be unloaded.  Whenever encouraged to participate in these exercises, Nathan Garrett refused.

34.     October 20 is also not the first time this "exercise" was played.  Develin explained it happened on a regular basis at Meade's Cabin.  It became later known that the genesis of this game was Develin's creation and that he, Leach and Meade (and not Nathan Garrett) were the primary participants.  Other soldiers of the unit described Develin as "sick" and having something wrong with him.  It was believed that he was under counselling for a form of Post Traumatic Stress Disorder from past experiences he had while previously deployed in Iraq.

35.     Per the unreliable accounts of the Guardsman Defendants, at approximately 11:00 p.m. on the evening of 20, October, 2021, Mr. Garrett was standing in the kitchen, leaning against the counter, facing the kitchen table around which the Guardsman Defendants and Nye were seated.  At the scene, all seven surviving individuals claimed to Deputy Mayle they were simultaneously looking in different directions when they heard Leach's Ruger discharge. All individuals then looked in the direction of Mr. Garrett to see him fall to the floor with blood pouring out of a gunshot wound to his head.

36.     At approximately 11:05 p.m. one of the Guardsman Defendants placed a call to Morgan County 911. There are various wildly inconsistent stories by the Guardsman Defendants and Nye about who was doing what between the time of the 911 call and Deputy Mayle arriving on scene at approximately 11:26 p.m.

37. Before emergency services responded to the scene, the Guardsman Defendants and Brenna Nye coordinated their "stories" to be as similar as possible; all denying seeing any gunfire, and ultimately falsely identifying the shooter as the one person who had no voice – Nathan Garrett, deceased. Despite being convinced that the survivors were all being deceitful, and without any supporting physical evidence, the MCSO adopted the tales of the Guardsman Defendants and concluded that the death of Nathan Garrett was due to an "accidental self-inflicted gun-shot wound" and closed its file just a few days later.

38. According to the paramedics who arrived on scene prior to Deputy Mayle, Van Liere, Allen, Leach, Haas, and Nye were standing in a group outside of the cabin upon their arrival. Due to their concern for Mr. Garrett's well-being, the paramedics entered the cabin prior to law enforcement reaching the scene.

39. Meade was inside the cabin cradling Mr. Garrett's deceased body. Nye attempted to enter the cabin and was verbally instructed to remain outside by the paramedics. While the paramedics were tending to Mr. Garrett, Develin walked out of the back bedroom where it was subsequently discovered that the Ruger was being stored after it had been removed from the scene of the shooting as Leach asserted.

40. Upon Deputy Mayle's arrival, he was immediately informed by the paramedics that Mr. Garrett was deceased. He was also advised of the efforts of the survivors to coordinate their "stories." After entering the Cabin and surveying the scene, Deputy Mayle contacted MCSO dispatch and requested the presence of a supervisor at the scene. Shortly thereafter, Sergeant Thomas Jenkins arrived, was advised by Mayle as to the situation, and then assisted in the initial gathering of information (e.g. Jenkins obtained permission from the Guardsman to search their private automobiles).

41.     Despite the chaotic crime scene, a dead body, the presence of several intoxicated individuals, and numerous firearms, neither Deputy Mayle nor Sgt. Jenkins made any attempt to initially secure the firearms, detain or segregate the individuals, take any blood-alcohol readings or any other trace evidence from the Guardsman Defendants, Nye, or Garrett.  This, despite being advised by the paramedics that they had observed Nye gathering the group of soldiers and coordinating "the story" they were going to tell law enforcement, and concluding himself that they were being deceitful.  Neither Deputy Sherrif verified that Garrett had even fired a weapon.

42.     Deputy Mayle instead attempted to gather information from the individuals in a group setting while all individuals are clearly in view and earshot of one another.  Under Sgt. Jenkins' supervision, Mayle simply handed witness statement forms to each of the individuals with the instructions to write down what happened while Mayle left that area and returned to the inside of the Cabin.  EMS personnel witnessed Nye using one of the forms that a guardsman had written on to show another from which another guardsman could document the same or similar information.

43.     Deputy Mayle did, however, attempt to contact Sheriff McGrath to come to the Property so that he could request further assistance from State investigators, purportedly since the circumstances of this incident exceeded the resources of the MCSO. Sheriff McGrath refused to come to the scene. Sheriff McGrath's refusal resulted in the inability to request assistance from the Ohio State Highway Patrol and/or Ohio Bureau of Criminal Investigation.  Sheriff McGrath has a well-known reputation in the local first responder community as becoming intoxicated after hours and thus reluctant to expose himself to incrimination by reporting to nighttime crime scenes and engaging the expertise and resources of other law enforcement agencies, even when warranted as in this case.

44.     When Mayle and Jenkins got around to asking about the firearm that had killed Mr. Garrett, he was told by the soldiers that it had been Leach's Ruger, without taking any steps to independently verify. Following the discharge that killed Nathan Garrett, Leach told Mayle he took possession of the weapon and removed it to the adjoining bedroom where he placed it into a carrying case and set the case on the floor under a desk – the very same room paramedics had later seen Develin depart. When the Ruger was presented to the Deputies, it did not have any blood on it or other residue. Meade and/or Leach later confirmed that the gun had been cleaned after the shooting.

45.     At approximately 12:30 a.m. Develin placed a call to the 174th AAD and advised them that Mr. Garrett was deceased due to a gunshot wound to the head.  About an hour later, Sergeant Jack Gillum arrived at the Cabin with a van. Deputy Mayle advised them that the stories of the Guardsman Defendants and Nye were inconsistent and that he believed that they were being deceitful.

46.     Inexplicably, despite the active crime scene and Deputy Mayle's belief that the Guardsman Defendants were lying about what happened, Mayle and Jenkins failed to make any effort to segregate the "witnesses" and interrogate further in an effort at gaining any glimpse of the truth.  The Deputies failed to take any of the soldiers into custody, or to make any arrests for, at the least, wrongful use of a firearm while drinking alcohol, or underage consumption of alcohol. Instead, the Deputies permitted the ONG to remove the Guardsman Defendants from the Property and return them to base where the ONG required each involved soldier to write statements.  Brenna Nye was permitted to drive home – even though she was underage, had been drinking, and had been caught lying to Mayle when he first spoke to her at the scene outside of the Cabin.  This was the last contact the MCSO had with the only civilian witness.

14

47.    The next morning (October 21, 2021), Sgt. Russell of the AAD contacted the MCSO and advised that the Guardsman Defendants could be further questioned regarding the death of Mr. Garrett now that they had a night's sleep and sobered-up.  It should have come to no surprise to Deputy Mayle that "upon reflection", the Guardsman Defendants had come up with an explanation as to why a loaded gun purportedly ended up in the hands of Nathan Garrett.

48.    The Guardsman Defendants arrived at the MCSO and were re-questioned by Mayle about the incident of the prior evening. All Guardsman Defendants arrived in identical clothing, with shirts that read "ARMY" across the front of them.

49.    During the October 21, 2021, interviews, most of the Guardsman Defendants' stories had changed dramatically from the night before.  For instance, instead of remaining consistent with his story to the MCSO that evening that he saw nothing, the next day Trance Van Liere claimed to Deputy Mayle that he in fact had witnessed the entire progression of the gun being loaded and Nathan Garrett being shot.  It was also the first time any of the Guardsman Defendants admitted to the Russian Roulette game being performed both that night, and before.

50.    What happened at the 174th Armory that evening is unknown at this time.  However, what is known is as they left the scene of the incident, a group of off duty National Guard soldiers and one civilian had been drinking, shooting guns, and one ended up dead while no one claimed to have seen what happened.  But the next morning, after the soldiers all showed up at the MCSO clean and sober, all of a sudden there was an explanation for what took place.  Since it was way too late for any of them to be implicated by physical evidence (i.e. gunshot residue) or other trace evidence, they felt comfortable revealing this Russian Roulette story to provide some plausible and convenient explanation for the MCSO to place the blame at the feet of the one person who could no longer speak for himself.

15

51.     Shortly after the Guardsman Defendants left the Sheriff's Office having purportedly "tied up the loose ends," Deputy Mayle was surprised to learn from Sheriff McGrath that Mayle was off the case and that he, McGrath, would take over the investigation.  Despite this, the MCSO did not conduct any further productive investigation into Mr. Garrett's death.  No gunshot residue testing was completed.  No fingerprints were taken.  No DNA testing was conducted. No ballistics analysis was conducted. No forensic analysis of the Cabin was performed to any extent.  Just as disturbing, no arrests were made, or criminal charges brought.

52.     Further, the MCSO never retrieved the shell casing or bullet that killed Mr. Garrett. When a handgun is discharged, there is a great deal of evidence that follows.  A cartridge (the brass part of the round that holds the gunpowder) is ejected from the side of the weapon and can travel through the air several feet.  At the other end of the round is the bullet.  It is projected from the end of the barrel and after expending its energy, embeds in some structure.  Along with these hard components, the weapon discharges a fair amount of smoke and residue that coats surfaces in the immediate area of the firing.

53.     ONG Sergeant John Russell, while visiting the Cabin the following morning to retrieve additional property of the soldiers, discovered a shell casing near the area of the shooting. He also observed what appeared to be a bullet strike in the wall behind the refrigerator.  He placed the casing in a bag and took a photo of the bullet-strike before delivering them to the MCSO.

54.     On February 14, 2022, Sheriff McGrath told the Garrett family that despite being provided the day after the shooting a photograph of the location of the subject bullet, that evidence had subsequently "disappeared".

55.     Despite all of the Guardsman Defendants and Nye being intoxicated and carelessly handling firearms as they performed the Russian Roulette ritual, no charges were filed. Allen and

Nye were under the age of twenty-one (21) at the time of the incident.  In fact, Sheriff McGrath "closed" his investigation just days after the incident at the Cabin.  From the incomplete and deficient "investigation" by McGrath, Mayle and Jenkins, Nathan Garrett's cause of death was designated as an accidental self-inflicted gunshot wound – a conclusion that most of the first responders and ONG officials do not believe based upon the conflicting, inconsistent and deceitful information, much of which is set forth above.  In fact, Meade told Nathan Garrett's sister several days later that Nathan had died when the gun accidentally fired while Nathan was trying "to clear it" – saying nothing about this Russian Roulette story.

56.     To date, neither MCSO, McGrath, Mayle, Jenkins nor ONG has conducted any form of a legitimate investigation of the physical evidence involved in the death of Mr. Garrett. Other than confiscating the handguns, the only other physical evidence retrieved from the scene is a lone cartridge that the MCSO had nothing to do with securing!  It came by happenstance through ONG Sgt. Russell on or about the same time Sheriff McGrath was working to close the MCSO file.  Hence, at best, the activities of the MCSO and the ONG could be characterized as only "superficial inquiries".

57.     Frustrated by the lack of progress, excuses, finger pointing and foot dragging by the government agencies, the Garrett family themselves began collecting information and evidence.  This included a deep examination of Discord, a popular free-messaging internet platform used primarily by younger people to converse while playing video games.

58.     The next year the ONG did perform a review of the Garrett killing as part of a larger inquiry into the military's concern of the influence of seditious local militant groups, the members of which are also state National Guardsmen.  The Garrett family was first advised on December 21, 2021, by Sergeant Harris of the 174th AAD that the ONG would only begin investigating once

17

the MCSO's file was closed – even though Sheriff McGrath had closed his inquiry two months earlier.  A month later, on January 14, 2022, Harris told the family that a Lieutenant Snyder was assigned by the ONG as the investigating officer for the incident that led to Nathan's death.  Snyder called Allen and Lisa Garrett and advised that while he could not get started until the following week, he would travel to their residence in Chardon, Ohio and interview them.  He was uninterested in the information the family had uncovered.  Snyder told them he first had to contact "legal" in order to get his parameters "left" and "right."  Snyder was never heard from thereafter.

59.     On April 5, 2022, ONG Lt. Colonel Bob Lytton spoke with Lisa Garrett.  Lytton was working at what he called the "Logistics Office" in Columbus, Ohio.  Lytton informed Lisa that he had been assigned to investigate Lt. Snyder, who had been removed from the previous inquiry into the death of Nathan Garrett.  Lytton also revealed to the family for the first time that there were body cam images from the MCSO of the October 20, 2021, incident that were a part of Lt. Snyder's file.  Lisa and Allen Garrett were shocked because they had previously requested all the evidence, including reports, photos and video from the MCSO back in the fall of 2021.  They were never provided with any bodycam footage, nor did the MCSO or the investigating Deputies suggest the existence of bodycam evidence.

60.     Since January, the family had been in touch with Detectives from the Columbus Police Department (CPD), the Ohio Bureau of Criminal Investigation (BCI), the Federal Bureau of Alcohol, Tobacco and Firearms (ATF), the Ohio Highway Patrol (OHP), and through a reporter, the Ohio Attorney General's Office (OAG).

61.     As a result of the disturbing, sadistic, racially offensive, misogynistic, and antisemitic posts of several of the Guardsmen Defendants on Discord that Allen and Lisa Garrett had discovered and shared with law enforcement, Meade and Develin were arrested and charged

with criminal offenses – unrelated to the death of Nathan Garrett.  One of Develin's threatening acts was directed towards the MCSO because of their refusal to return his handguns now that the case was closed.  The Discord text on this subject even showed the aerial photograph of a Deputy's private residence with the threat that "I'm going to make it a very bad day to be a law enforcement representative of [*sic*] Thursday."  The responses state: "They are corrupt as f**k and no one would miss them if they were unalive."  To which Develin responds, "…Or I'll just go to Jenkin's house in the night with my nods and unalive him."  The response states: "Do the whole family in they are all pieces of shit.  And hang the corpses up for all to see."

62.     When presented with these threats, Sheriff McGrath casually dismissed them as the harmless rantings of upset young men.  Federal investigators thought enough of this and other threats (fly an airplane into the Columbus Budweiser Brewery Towers in the fashion of 9/11 and shooting up a Columbus Jewish Synagogue) to charge Develin with hate crimes.  This member of the Ohio National Guard and fellow radar missile artillery soldier with the Guardsmen Defendants plead guilty and is currently incarcerated in Federal Prison.

63.     Prior to Develin's capture and prosecution, the ATF discovered in his cell phone texts between him and another Guardsman (who is believed to be Trance Van Liere) where they discuss feeling pressure from various law enforcement agencies and covering up for themselves by hiding and destroying evidence.  But just as importantly, one of the texts which is identified on page 46 of the affidavit of in support of the Federal Criminal Complaint filed against Develin (Case: 2:22-mj-00460-CMV filed 6/28/22) is from March 28, 2022, between Develin and a person believed to be Van Liere states:

[Sender believed to be Van Liere] Once I Get back, I think we should all meet.  Discuss what we're going to do going forward.  I'm sure by the time I'm back at some point next month we will know more.

[Develin]      As long as we're all on the same page.  We'll be fine.
F\*\*k our leadership.  They've told [redacted name] and I that they're on our side in the past but obviously with this new development they don't want to tell us.

Now that the walls are closing in on Develin six months after Garrett's death, he expresses concern that due to the new misconduct, the Guard may no longer be on his side as it was before.

64.    As a consequence of the conscious wrongdoing of the MCSO, the ONG and the Guardsman Defendants (including Brenna Nye), Plaintiff has been denied the ability to identify the person(s) who is directly responsible for the shooting of Nathan Garrett and has been denied a legal remedy against such tortfeasors directly for the death of her son.

### FIRST CLAIM FOR RELIEF
### AS TO THE ONG DEFENDANTS
### 42 USC § 1983 DENIAL OF ACCESS

65.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

66.    Absent Defendants' intentional concealment of the true evidence of the underlying crimes, Plaintiff would have a valid wrongful death claim for the death of Mr. Garrett against a primarily liable tortfeasor pursuant to Ohio Revised Code Section 2515.01 *et seq.*  Instead, at best, depending on what action the U.S. Attorney determines to consider any of the National Guard Defendants as federal employees under 32 U.S.C. §502 and 28 U.S.C. §2671, Plaintiff may be limited to proceeding with only a premises liability action against one or two individual civilian parties.[1]

---

[1] To counsel's knowledge there is no basis for a claim of federal jurisdiction over the Ohio National Guard in this case.  When on duty, the soldiers were on extended basic training and not within the service, even temporary, of the United States.  Nevertheless, any claims against soldiers, whether regular Army or National Guard, are routinely reviewed by the U.S. Attorney for FTCA determination.  To that extent, all claims herein are brought against agencies and employees of the State of Ohio acting "under color of State law."  In the event the U.S. Attorney takes the position that the ONG Defendants and Guardsman Defendants were engaged in the service of the United States, Plaintiff has delivered a Form 95 claim to the Department of the Army prior to the filing of the within action.

67.     As employees and officers of the State of Ohio, the ONG Defendants, in order to cover for the Guardsman Defendants, with the active assistance of the MCSO, McGrath, Jenkins and Mayle, intentionally obstructed the investigation into the death of Mr. Garrett by, *inter alia,* removing the Guardsman Defendants from the scene of the crime and later disposing of evidence (cleaning of the scene in the following days, failing to take any trace evidence samples from the Guardsman Defendants and letting them clean, sober-up and then report sanitized to the MCSO the following day).  This same misconduct served to both perpetuate the conspiracy of the Guardsman Defendants with Brenna Nye to falsify the true events of the Garrett shooting and ratify the cover-up of any potential direct liability for the Guardsmen Defendants' wrongdoing.

68.     The misfeasance continued in the following months when despite overwhelming evidence that one or more soldiers were directly involved in criminal conduct, the ONG failed to take any timely steps to interrogate witnesses, collect and preserve evidence, and conduct any necessary scientific testing such as gunshot residue, fingerprints, ballistics, blood splatter patterns before the evidence either became too old, unreliable, or just completely disappeared.

69.     Such misconduct is exemplified by the communication of Sgt. Mike Harris to the Garrett family on December 21, 2021, that the ONG could not conduct any investigation until the MCSO had closed their file despite Sheriff McGrath terminating their investigation days after the shooting in October.

70.     This comedy of errors more resembles an episode of the classic slap-stick "Three Stooges" routine when instead of Larry, Curly or Moe, these two public agencies point their fingers at each other when asked: "who is doing the investigation into Nathan Garrett's death?"  If only the reality were amusing.  The fact of the matter is that the ONG Defendants and the MCSO had an overly chummy relationship wherein one would cover for the other when issues of criminal acts

and jurisdiction crossed paths.  It is as the Garrett family were told on July 2, 2023 by Sgt. Harris, that if Nathan Garrett's death had occurred on a base near a larger city, the ONG Criminal Investigation Department ("CID") would have been involved immediately, and would not have finished until complete physical, forensic and eye-witness evidence were secured and thoroughly tested.  Instead, the ONG Defendants sat by with either their hands in their pockets until orders from high above came down to start looking into domestic terrorism concerns were voiced, or actively tolerated the criminal wrongdoing of Sergeant Tom Develin.

71.     The fact of the matter is that by reinstating most if not all of the Guardsmen Defendants who were not criminally charged by law enforcement agencies other than the MCSO, the ONG Defendants have ratified the criminal misconduct of those individuals. Indeed, the recent reinstatement of Specialist Christopher Leach in light of his admitted reckless handling of his firearm on October 20, 2021, reinforces this point.

72.     The fact of the matter is that none of the ranking supervisory NCO at the AAD believe the concocted stories of Leach and others that Nathan Garrett shot himself.  Instead, most of them believe it was Leach who accidentally shot Garrett as part of his mishandling of the "dry-fire" re-loading of his brand new handgun as he stood next to his friend and comrade.

73.     Due to the intentionally obstructive actions taken by the ONG Defendants under color of state law, the underlying wrongful death claim has been substantially prejudiced in a manner that cannot be remedied by a state court.  This serves to deny Plaintiff access to a state remedy in violation to their Due Process rights under the Fourteenth Amendment of the U.S. Constitution, the Equal Protection Clause under the same provision, the First Amendment, and the Privileges and Immunities Clause of Article IV.

74.     Due to the obstructive actions by the ONG Defendants, Plaintiff was completely deprived of a directly liable tortfeasor for the underlying wrongful death action.

75.     Absent the intentionally obstructive and deceitful action by the ONG Defendants there would have been a reasonable likelihood of identifying a primarily liable tortfeasor in the underlying wrongful death action.

76.     As a direct and proximate result of Defendants' joint and several wrongdoing,  the decedent, and the decedent's Estate, surviving heirs and next of kin have suffered and will continue to suffer damages including the loss of the decedent's support, services, society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education, prospective inheritance, great mental anguish, and other fair and just damages. Decedent Nathan Garrett also suffered pre-death emotional and physical pain and suffering, and for himself and his Estate, surviving heirs and next of kin, suffered loss of earnings, earning capacity and benefits of employment.

77.     Wherefore, for this First Claim for Relief, Plaintiff prays for damages against the ONG Defendants, jointly and severally, in their individual and professional capacity, in an amount in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) which will fully compensate for the loss and damages including, but not limited to, attorneys' fees, case expenses, costs of suit, and interest as permitted by law.

### SECOND CLAIM FOR RELIEF
### AS TO THE ONG DEFENDANTS
### VIOLATION OF R.C. 2921.32 OBSTRUCTING JUSTICE

78.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully restated herein and further states:

79. As set forth in paragraphs 66 through 75 above, and to avoid duplication, the ONG Defendants, with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another, did destroy or conceal physical evidence of a crime or act and induce any person to withhold testimony or information.

80. The ONG Defendants, with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another, did communicate false information to the MCSO and the ONG Defendants.

81. The ONG Defendants, with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another, did prevent or obstruct any person, by means of force, intimidation, or deception, from performing any act to aid in the discovery, apprehension, or prosecution of any person.

82. The ONG Defendants' actions constitute violations of R.C. 2921.32, Obstructing Justice.

83. The ONG Defendants' acts and omissions were with malicious purpose, in bad faith, and in a wanton and reckless manner.

84. Pursuant to R.C. 2307.60, Plaintiff has suffered damages as a result of an act committed in violation of R.C. 2921.32 and is entitled to full compensatory damages, punitive or exemplary damages, court costs, and other reasonable expenses and attorneys' fees incurred in maintaining this action.

### THIRD CLAIM FOR RELIEF
### AS TO THE MCSO DEFENDANTS
### 42 USC § 1983 DENIAL OF ACCESS

85. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

86.     Plaintiff had a valid wrongful death claim for the death of Mr. Garrett.

87.     The MCSO Defendants (including McGrath, Jenkins and Mayle in their individual capacities) intentionally obstructed the investigation into the death of Mr. Garrett.

88.     Due to the intentionally obstructive actions taken by the MCSO Defendants the underlying wrongful death claim has been substantially prejudiced in a manner that cannot be remedied by a state court.

89.     Due to the obstructive actions by the MCSO Defendants, Plaintiff was completely deprived of a suspect for the underlying wrongful death action.

90.     Absent the intentionally obstructive action by the MCSO Defendants there would have been a reasonable likelihood of identifying a defendant in the underlying wrongful death action.

91.     As a direct and proximate result of Defendants' joint and several wrongdoing, the decedent, and the decedent's Estate, surviving heirs and next of kin have suffered and will continue to suffer damages including the loss of the decedent's support, services, society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education, prospective inheritance, great mental anguish, and other fair and just damages. Decedent Nathan Garrett also suffered pre-death emotional and physical pain and suffering, and for himself and his Estate, surviving heirs and next of kin, suffered loss of earnings, earning capacity and benefits of employment.

92.     Wherefore, for this Third Claim for Relief, Plaintiff prays for damages against the MCSO Defendants (McGrath, Jenkins and Mayle individually), jointly and severally, in their individual and professional capacities, in an amount in excess of Twenty-Five Thousand and

00/100 Dollars ($25,000.00) which will fully compensate for the loss and damages including, but not limited to, attorneys' fees, case expenses, costs of suit, and interest as permitted by law.

**FOURTH CLAIM FOR RELIEF**
**AS TO THE MCSO DEFENDANTS**
**VIOLATION OF R.C. 2921.32 OBSTRUCTING JUSTICE**

93.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

94.     The MCSO Defendants (including McGrath, Jenkins and Mayle in their individual capacities), with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another, did destroy or conceal physical evidence of a crime or act and induce any person to withhold testimony or information.

95.     The MCSO Defendants, with the purpose of hindering the discovery, apprehension, prosecution, conviction, or punishment of another, did communicate false information to any person.

96.     The MCSO Defendants, with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another, did prevent or obstruct any person, by means of force, intimidation, or deception, from performing any act to aid in the discovery, apprehension, or prosecution of any person.

97.     The MCSO Defendants' actions constitute a violation of R.C. 2921.32, Obstructing Justice.

98.     The MCSO Defendants' acts and omissions were with malicious purpose, in bad faith, and in a wanton and reckless manner.

99.     Pursuant to R.C. 2307.60, Plaintiff has suffered damages as a result of an act committed in violation of R.C. 2921.32 and is entitled to full compensatory damages, punitive or

exemplary damages, court costs, and other reasonable expenses and attorneys' fees incurred in maintaining this action.

### FIFTH CLAIM FOR RELIEF
### AS TO THE ONG DEFENDANTS AND MCSO DEFENDANTS
### 42 USC § 1983 CIVIL CONSPIRACY

100.    Plaintiff incorporates by reference each and every allegation set forth in preceding paragraphs as if fully rewritten herein and further states:

101.    The ONG Defendants and MCSO Defendants (including McGrath, Jenkins and Mayle in their individual capacities) did engage in a single plan with the conspiratorial objective to intentionally deprive Plaintiff access to the courts by intentionally and maliciously destroying evidence and obstructing the investigation into the death of Mr. Garrett.

102.    The ONG Defendants and MCSO Defendants did commit overt acts in furtherance of their conspiracy by way of removing the Guardsman Defendants from the scene of the crime, allowing the Guardsman Defendants to be removed from the scene of the crime, destroying evidence by intentionally disposing of the bullet and shell casing, and intentionally failing to conduct an investigation into the death of Mr. Garrett.

103.    The ONG Defendants' and MCSO Defendants' conspiracy injured Plaintiff by intentionally depriving her of a wrongful death suspect for the death of Mr. Garrett.

104.    Wherefore, for this Fifth Claim for Relief, Plaintiff prays for damages against the MCSO Defendants (including McGrath, Jenkins and Mayle individually), jointly and severally, in their individual and professional capacity, in an amount in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) which will fully compensate for the loss and damages including, but not limited to, attorneys' fees, case expenses, costs of suit, and interest as permitted by law.

### SIXTH CLAIM FOR RELIEF
### AS TO THE GUARDSMAN DEFENDANTS AND NYE
### VIOLATION OF R.C. 2921.32 OBSTRUCTING JUSTICE

105.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

106.     The Guardsman Defendants and Brenna Nye, in their individual capacities, and Defendant Develin also as a supervisory agent of the ONG, with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another, did destroy or conceal physical evidence of a crime or act and induce any person to withhold testimony or information.

107.     The Guardsman Defendants and Brenna Nye, in their individual capacities, and with Defendant Develin also as a supervisory agent of the ONG, with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another, did communicate false information to any person.

108.     The Guardsman Defendants' and Nye's actions constitute violations of R.C. 2921.32, Obstructing Justice.

109.     Pursuant to R.C. 2307.60, Plaintiff has suffered damages as a result of an act committed in violation of R.C. 2921.32 and is entitled to full compensatory damages, punitive or exemplary damages, court costs, and other reasonable expenses and attorneys' fees incurred in maintaining this action.

### SEVENTH CLAIM FOR RELIEF
### AS TO THE ONG AND GUARDSMAN DEFENDANTS AND NYE
### VIOLATION OF R.C. 2923.15 USING WEAPONS WHILE INTOXICATED

110.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

111.     On October 20, 2021, at the time of Mr. Garrett's death, the Guardsman Defendants and Nye in their individual capacities, and Defendant Develin as an agent of the ONG, were intoxicated, and/or consumed sufficient alcohol to be impaired.

112.     On October 20, 2021, at the time of Mr. Garrett's death, the Guardsman Defendants and Nye were all handling firearms in their individual capacities, and Develin also in his capacity as a supervisory agent with the ONG.

113.     The Guardsman Defendants' and Nye's actions constitute violations of 2923.15, Using Weapons While Under the Influence of Alcohol.

114.     The injurious wrongdoing of the Guardsmen Defendants in their individual capacities and Defendant Develin also as a supervisory agent for the ONG, creates vicarious liability for the ONG Defendants.  Further, the ONG Defendants are also liable from a primary liability standpoint for knowing of the misconduct through the instances *before* Nathan Garrett was killed, actively participating in it through Sergeant Develin, and in ratifying the misconduct by retaining the Guardsman Defendants after learning of the drunken usage of the handgun "exercise".

115.     As a direct and proximate result of Defendants' joint and several wrongdoing,  the decedent, and the decedent's Estate, surviving heirs and next of kin have suffered and will continue to suffer damages including the loss of the decedent's support, services, society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education, prospective inheritance, great mental anguish, and other fair and just damages. Decedent Nathan Garrett also suffered pre-death emotional and physical pain and suffering, and for himself and his Estate, surviving heirs and next of kin, suffered loss of earnings, earning capacity and benefits of employment.

116.    Pursuant to R.C. 2307.60, Plaintiff has suffered damages as a result of an act committed in violation of R.C. 2923.15 and is entitled to full compensatory damages, punitive or exemplary damages, court costs, and other reasonable expenses and attorneys' fees incurred in maintaining this action.

**EIGHTH CLAIM FOR RELIEF
AS TO ALL DEFENDANTS,
CIVIL CONSPIRACY**

117.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

118.    By destroying evidence, intentionally obstructing the investigation into the death of Mr. Garrett, and ratifying the misconduct of its agents/employees by the ONG Defendants, all Defendants maliciously conspired, expressly or tacitly, in pursuance of a common plan or design to injure Plaintiff by way of Obstructing Justice in violation of R.C. 2921.32.

119.    The conspiracy undertaken by the Defendants did cause injury to Plaintiff by way of depriving her of a primarily liable wrongful death tortfeasor for the death of Nathan Garrett.

120.    Wherefore, for this Eighth Claim for Relief, Plaintiff prays for damages against the ONG Defendants, the MCSO Defendants (including McGrath, Jenkins and Mayle individually), and The Guardsman Defendants, including Brenna Nye, jointly and severally, in their individual and professional capacities, in an amount in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) which will fully compensate for the loss and damages including, but not limited to, attorneys' fees, case expenses, costs of suit, and interest as permitted by law.

## NINTH CLAM FOR RELIEF
## ONG DEFENDANTS
## FREEDOM OF INFORMATION ACT VIOLATION

121.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

122.    The Ohio National Guard has performed at least one review that included some reference to the shooting death of Nathan Garrett.  The first and more comprehensive is that done by Captain Matthew Jacobs, USA, which was initiated to look into potential infectious influence of radical seditious militia within the Ohio National Guard.  Captain Jacob's review included the shooting death of Nathan Garrett.

123.    The second official review is what is called a "Loss on Duty" or ("LOD") determination.

124.    Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, Plaintiff first officially submitted a request for production of this information on May 10, 2022.  The request was acknowledged by Chief Warrant Officer Janet L. Blain of the Ohio Army National Guard on May 25, 2022 (Exhibit A).

125.    With no further action from the ONG, on February 19, 2023, Plaintiff sent a **second** request for information which was acknowledged again by Chief Blain on February 21, 2023 (Exhibit B).

126.    Again, with nothing but silence from the ONG, other than acknowledgment letters, on June 6, 2023, Counsel for Plaintiff, John Liber, sent a letter to Chief Blain inquiring as to the basis for the excessive delay in producing the information (Exhibit C).  As of March 6, 2024,  there has been no response to counsel's letter.

127.     Plaintiff has it upon information and belief that the report prepared by Captain Jacobs has been presented to the ONG Adjunct, Major General John C. Harris, who has not only presented it to Governor Michael DeWine, but also presented it to a board of public officials including the Governor, the Attorney General and others.  In fact, Plaintiff believes that a redacted version of the Jacobs report currently is sitting on General Harris's desk (or on an underling's desk in the General's office) and has been so situated for months.

128.     Pursuant to 5 U.S.C. § 552 *et seg.*, Plaintiff's lawful and reasonable request has gone unanswered by the ONG for over a year and a half (21 months) since first request.

129.     Wherefore, pursuant to the Freedom of Information Act, Plaintiff respectfully demands that this Honorable Court order the immediate production of the *unredacted* Jacobs report – at the least (or at least those portions that deal with the shooting death of Nathan Garrett) – as well as the statements completed by the Guardsmen Defendants (and any of the ONG Defendants) on or around October 20-21, 2021.  Plaintiff also respectfully demands that the Court impose a penalty upon the ONG pursuant to 5 U.S.C. § 552 *et seq.* at $100 per day from June 10, 2022 (30 days after Plaintiff's first FOIA request) through to the present and for every day into the future that the request remain outstanding and ignored.

**TENTH CLAIM FOR RELIEF**
**ONG DEFENDANTS ONLY**
**NEGLIGENT RETENTION**

130.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

131.     As the employer of Defendant Develin, ONG and the ONG Defendants are independently liable for the negligent retention, supervision and promotion of Develin because the ONG Defendants chose to employ and retain Develin who had a history of criminal, tortious or

otherwise dangerous conduct about which the ONG Defendants knew and/or could have discovered through reasonable investigation.  As set forth above, the evidence in support of this claim involves, *inter alia*¸ the ONG Defendants' knowledge of Develin's mental health condition(s), the treatment therefor, and the previous misconduct he, Meade and Leach carried out at the Cabin with the intoxicated handgun exercise where a firearm actually discharged into the floor on a prior occasion.

132.    A special relationship also existed between the ONG Defendants and Nathan Garrett, who was an off-duty employee of the ONG at the time of his death.  Since the ONG Defendants knew of the dangerous firearm exercise performed by Develin, Meade and Leach, when drinking alcohol during off-duty socializing away from the ADD, Defendants owed a duty to off duty employees like Garrett to prevent foreseeable injury by exercising reasonable care to refrain from continuing to employ incompetent employees like Develin.

133.    Had the ONG Defendants complied with their duty to employees like Garrett, Develin would never have been in the position to engage in the drunken shooting exercise/game and Nathan Garrett would be alive today.

134.    As a direct and proximate result of Defendants' joint and several wrongdoing,  the decedent, and the decedent's Estate, surviving heirs and next of kin have suffered and will continue to suffer damages including the loss of the decedent's support, services, society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education, prospective inheritance, great mental anguish, and other fair and just damages. Decedent Nathan Garrett also suffered pre-death emotional and physical pain and suffering, and for himself and his Estate, surviving heirs and next of kin, suffered loss of earnings, earning capacity and benefits of employment.

**WHEREFORE,** Plaintiff respectfully demands judgment against the Defendants for compensatory damages in excess of $25,000 each. Further, because Defendants' conduct was intentional, malicious, and/or with reckless disregard for the welfare of Plaintiff, Plaintiff respectfully demands punitive damages. Plaintiff also respectfully demands reasonable attorneys' fees, costs, and all other relief to which Plaintiff may be lawfully entitled under all applicable state and federal law. Finally, pursuant to the FOIA, plaintiff demands judgment against the ONG Defendants in the current amount of $63,500.00 for the 635 days Defendants have refused to comply with the FOIA to date.  To the extent the violation continues, Plaintiff prays to revise this amount for each day Defendants remain deficient.

Respectfully submitted,

/s/ *John R. Liber, II*
**JOHN R. LIBER, II** (0058424)
**LEO M. SPELLACY** (0067304)
**CHRISTOPHER R. ELKO** (0101860)
Thrasher Dinsmore & Dolan, LPA
1282 West 58th Street
Cleveland, Ohio 44102
216.255.5431 | Fax 216.255.5450
jliber@tddlaw.com
lspellacy@tddlaw.com
celko@tddlaw.com

*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

/s/ *John R. Liber, II*
**JOHN R. LIBER, II** (0058424)
**LEO M. SPELLACY** (0067304)
**CHRISTOPHER R. ELKO** (0101860)

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing was filed via the Court's electronic filing system on March 6, 2024. All represented parties will be notified electronically. Additionally, the following parties that have not yet entered an appearance were served via regular United States mail:

> Ohio National Guard
> c/o Major General John C. Harris, Jr.
> 2825 West Dublin Granville Rd.
> Columbus, Ohio 43235
>
> Angela Wilker
> c/o Ohio National Guard
> 2825 West Dublin Granville Rd.
> Columbus, Ohio 43235
>
> Lawrence Bogan
> c/o Ohio National Guard
> 2825 West Dublin Granville Rd.
> Columbus, Ohio 43235
>
> Jack Gillum
> c/o Ohio National Guard
> 2825 West Dublin Granville Rd.
> Columbus, Ohio 43235
>
> Thomas Develin
> Inmate No. 08421-510
> FCI Elkton
> P.O. Box 10
> Lisbon, Ohio 44432
>
> Jordan C. Haas
> 1120 22nd St. NE
> Canton, Ohio 44714
>
> Christopher Leach
> 106 Quail Creek Drive
> Gallipolis, Ohio 45631

> _/s/ John R. Liber, II_
> **John R. Liber, II** (0058424)

35