# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**Lisa Garrett,**
**Individually and as**
**Administrator of the Estate**
**Of Nathan Alexander Garrett**

Case No.  **1:23CV2011**

**JUDGE PAMELA A. BARKER**

**Plaintiff,**

–vs–

**MEMORANDUM OPINION & ORDER**

**Morgan County Sheriff's Office,**
**et al.,**

**Defendants.**

Currently pending is the "Notice of Deficient Service" filed by Defendants the Ohio National Guard ("ONG") c/o Major General John C. Harris, Jr.; Jack Gillum; Angela Wilker; and Lawrence Bogan (hereinafter referred to collectively as "the ONG Defendants"). (Doc. No. 66.)  Plaintiff Lisa Garrett, Individually and as Administrator of the Estate of Nathan Alexander Garrett (hereinafter "Plaintiff"), filed a Response on March 27, 2024.  (Doc. No. 69.)  Pursuant to an Order of this Court dated April 15, 2024, the ONG Defendants filed a Supplemental Brief on April 29, 2024.  (Doc. No. 87.)  Plaintiff filed a Response on May 13, 2024, to which the ONG Defendants replied on May 20, 2024.  (Doc. Nos. 90, 93.)

The issue before the Court is whether, for purposes of the allegations and claims in Plaintiff's Amended Complaint, the ONG Defendants are federal actors and, therefore, required to be served in accordance with Fed. R. Civ. P. 4(i).  The ONG Defendants assert that they are, indeed, federal actors because they were acting in their federal capacities during the time periods covered by the Amended Complaint.  Plaintiff insists that the ONG Defendants were acting under color of state law for all

relevant purposes and, further, that the ONG Defendants have been properly served under Fed. R. Civ. P. 4(e). For the following reasons, the Court finds, based on the limited record before it and for purposes of this Opinion only, that the ONG Defendants are federal actors with respect to at least some of Plaintiff's claims and, therefore, must be served in accordance with Fed. R. Civ. P. 4(i).

## I.     Relevant Factual Allegations

To fully evaluate the service issue raised by the parties, the Court must begin with a careful discussion of the allegations and claims set forth in the Amended Complaint.

In October 2021, Nathan Alexander Garrett ("Garrett") was a member of the ONG, 2nd Battalion, 174th Air Artillery Defense Brigade ("AAD"), located on Hawk Drive in McConnelsville, Ohio.  (Doc. No. 44 at ¶¶ 7, 23.)  Defendants Cruz Allen, Trance Van Liere, Thomas Develin, James Meade, Christopher Leach, and Jordan Haas (hereinafter referred to collectively as "the Guardsmen Defendants") were also members of the ONG AAD at all relevant times.  (*Id.* at ¶¶ 7, 11-16.)

Plaintiff alleges that the ONG "is and was, at all times relevant herein, an agency of the State of Ohio, the administration of which is the responsibility of Major General Harris."[1]  (*Id.* at ¶ 7.)  *See also id.* at ¶ 24. Plaintiff alleges that "Major General John C. Harris, Jr. is responsible for the command of the ONG and supervises the day-to-day operations and management of the readiness, fiscal, personnel, equipment and real property resources of the ONG." (*Id.* at ¶ 7.) According to the Amended Complaint, at all times relevant herein, Defendant Gillum was the "ONG First Sergeant of the AAD;"  Defendant Wilker was the "ONG Captain of the AAD;" and Defendant Bogan was "the ONG Commanding Officer of the AAD."  (*Id.* at ¶¶ 8, 9, 10.)

---

[1] Plaintiff acknowledges, however, that "[t]he ONG also serves, when properly designated, [as] a reserve component of the U.S. Military consisting of a variety of combat, combat support, and combat service support units headquartered in Columbus, Ohio." (*Id.* at ¶ 7.)

On October 20, 2021, Garrett and the Guardsmen Defendants "were generally present in McConnelsville, Morgan County, Ohio, under orders from the ONG for extended basic training – also known as 'drill' – from Tuesday, October 19 through Sunday, October 24."[2]  (*Id.* at ¶¶ 23, 24.)  Garrett, Allen, Develin, Meade, Leach and Haas[3] were released from "drill" at around 5:30 p.m. on that day, and "given permission to spend the evening socializing at an off-base residence as they had done on multiple occasions in the past."  (*Id.* at ¶ 26.)  Garrett, Allen, Develin, Meade, Leach, and Haas traveled in separate private vehicles off the AAD base to a private residence owned by Meade's grandmother (hereinafter referred to as "the Cabin").  (*Id.*)  According to Plaintiff, "[t]he unit of guardsmen were planning on an evening of drinking and discharging handguns, as they had engaged in on many occasions in the past."  (*Id.*)

Van Liere and Defendant Brenna Nye arrived at the Cabin between 10:00 and 11:00 p.m.  (*Id.* at ¶ 28.)  As the evening progressed, Garrett, the Guardsmen Defendants, and Nye "made their way to the kitchen table telling stories and drinking alcohol."  (*Id.* at ¶ 29.)  A Ruger 9mm semi-automatic pistol owned by Leach, and a Glock 19 9mm and .40 caliber Sig 420 handgun owned by Develin, were on the kitchen table.  (*Id.*)  Additionally, several rifles owned by Meade were "located in various areas around the Cabin."  (*Id.*)

---

[2] Plaintiff further alleges that: "The particular crew that the Guardsman Defendants (and Nathan Garrett) were part of is the missile artillery unit 'Bravo Battery.' There are two components of each of the four batteries at the 174th, a mobile radar unit, and a mobile missile unit.  In Bravo Battery, the radar unit's code name was 'Golf,' and the missile unit's [code name was] 'Sierra.' Garrett and the other six soldiers at the Cabin that night were all assigned to the Golf radar unit."  (*Id.* at ¶ 25.)

[3] Defendant Van Liere was earlier granted leave to be off the entire day on October 20, 2021 to attend a funeral. (*Id.* at ¶ 26.) As set forth *infra*, later that evening, Van Liere and his friend, Defendant Brenna Nye, joined Garrett, Allen, Develin, Meade, and Haas at the off-base residence where the incident involving Garrett occurred.

Leach and Develin discussed and demonstrated the different components of the three handguns and began to remove the magazines, pull back on the slides, reinsert empty magazines, close the slide and pull the trigger to achieve what is known as a "dry fire" with what should be an unloaded weapon. (*Id*. at ¶ 30.)  Plaintiff alleges that, "[a]t this point, the circumstances transformed … to a disturbing and dangerous variation of" Russian Roulette." (*Id*. at ¶ 31)  Specifically, Plaintiff alleges that, "instead of safely dry firing the weapons in a safe direction (such as the floor), those around the table began to pass a gun from one person to another." (*Id*.)  "When it was handed-off, the recipient would eject the magazine, pull the slide back to purportedly verify the gun was not loaded, replace the empty magazine, and cause the slide to return to position resulting in what is supposed to be an unloaded, but charged weapon." (*Id*.)  "The person would then take the firearm, point it at their temple, and while consuming more alcohol, dry fire the trigger resulting in the 'click' of the firing pin." (*Id*.)  Plaintiff alleges that the Guardsmen Defendants had previously engaged in this "game" or "exercise" at the Cabin, but that Garrett refused to participate. (*Id*. at ¶¶ 33, 34.)

At approximately 11:00 p.m. on October 20, 2021, Garrett was standing in the kitchen, leaning against the counter, facing the kitchen table where the Guardsman Defendants and Nye were seated. (*Id.* at ¶ 35.)  The Guardsman Defendants and Nye later explained that they were simultaneously looking in different directions when they heard Leach's gun discharge. (*Id*.)  All individuals then looked in Garrett's direction to see him fall to the floor with blood pouring out of a gunshot wound to his head. (*Id*.)  At approximately 11:05 p.m., one of the Guardsmen Defendants called 911. (*Id*. at ¶ 36.)

Paramedics arrived first, followed by Defendant Morgan County Sheriff's Deputy Alex Mayle. (*Id.* at ¶¶ 36, 38.)  Plaintiff alleges that, before the paramedics arrived, the Guardsman

4

Defendants and Nye coordinated their "stories" to be as similar as possible— "all denying seeing any gunfire, and ultimately falsely identifying the shooter as the one person who had no voice – Nathan Garrett." (*Id*. at ¶ 37.) Deputy Mayle arrived at the scene at approximately 11:26 p.m. (*Id*. at ¶ 36.) Upon his arrival, the paramedics informed him that Garrett was deceased. (*Id.* at ¶ 40.) After entering the Cabin and surveying the scene, Deputy Mayle contacted the Morgan County Sheriff's Office ("MCSO") dispatch and requested a supervisor's presence. (*Id*.) Shortly thereafter, Defendant Morgan County Sergeant Thomas Jenkins arrived, was advised of the situation by Deputy Mayle, and assisted in gathering information from the individuals present. (*Id*.)

According to Plaintiff, "neither Deputy Mayle nor Sgt. Jenkins made any attempt to initially secure the firearms, detain or segregate the individuals, take any blood-alcohol readings or any other trace evidence from the Guardsman Defendants, Nye, or Garrett." (*Id.* at ¶ 41.) Instead, Deputy Mayle "attempted to gather information from the individuals in a group setting while the individuals were clearly in view and earshot of one another."[4] (*Id.* at ¶ 42.) Deputy Mayle and Sergeant Jenkins were told by the soldiers that it had been Leach's Ruger that fired the shot that killed Garrett. (*Id.* at ¶ 44.) Leach told Deputy Mayle that, after Garrett was killed, Leach took possession of the weapon and removed it to the adjoining bedroom where he placed it into a carrying case and set the case on the floor under a desk.[5] (*Id*.) When the Ruger was presented to the Deputies, it "did not have any

---

[4] Deputy Mayle did attempt to contact Defendant Morgan County Sheriff Douglas McGrath to come to the scene so that he could request further assistance from State investigators. (*Id*. at ¶ 43.) Sheriff McGrath, however, refused to do so, which resulted in the inability to request assistance from the Ohio State Highway Patrol and/or Ohio Bureau of Criminal Investigation. (*Id*.)

[5] When the paramedics arrived, they allegedly saw Develin walking out of this same bedroom where the Ruger had been placed by Leach. (*Id*. at ¶¶ 39, 44.)

blood on it or other residue." (*Id*.)  According to Plaintiff, "Meade and/or Leach later confirmed that the gun had been cleaned after the shooting." (*Id*.)

At approximately 12:30 a.m. on October 21, 2021, Develin placed a call to the ONG 174th AAD and advised them that Garrett was deceased due to a gunshot wound to the head.  (*Id*. at ¶ 45.)  About an hour later, Defendant ONG Sergeant Jack Gillum arrived at the Cabin with a van.  (*Id*.)  Deputy Mayle "advised them that the stories of the Guardsman Defendants and Nye were inconsistent and that he believed that they were being deceitful." (*Id*.)  Despite these concerns, Deputy Mayle and Sergeant Jenkins "permitted the ONG to remove the Guardsman Defendants from the Property and return them to base where the ONG required each involved soldier to write statements." (*Id*. at ¶ 46.)  Nye was permitted to drive home, even though she was underage and had been drinking.  (*Id*.)

Later during the morning of October 21, 2021, Sgt. Russell of the ONG AAD contacted the MCSO and advised that the Guardsman Defendants could be further questioned regarding Garrett's death "now that they had a night's sleep and sobered-up." (*Id*. at ¶ 47.)  The Guardsman Defendants arrived at the MCSO and were re-questioned by Deputy Mayle about the incident of the prior evening.  (*Id*. at ¶ 48.)  "All Guardsman Defendants arrived in identical clothing, with shirts that read 'ARMY' across the front of them." (*Id*.)  During the October 21, 2021, interviews, "most of the Guardsman Defendants' stories had changed dramatically from the night before." (*Id.* at ¶ 49.)  "For instance, instead of remaining consistent with his story to the MCSO that evening that he saw nothing, the next day Trance Van Liere claimed to Deputy Mayle that he in fact had witnessed the entire progression of the gun being loaded and Nathan Garrett being shot." (*Id*.)  It was also the first time any of the Guardsman Defendants admitted to the Russian Roulette game being performed both that night, and before.  (*Id*.)

6

Shortly after the Guardsmen Defendants left the MCSO's Sheriff's Office, Sheriff McGrath took Deputy Mayle off the case and took over the investigation.  (*Id.* at ¶ 51.)  Plaintiff claims that, thereafter, "the MCSO did not conduct any further productive investigation into Mr. Garrett's death." (*Id.*)  In particular, Plaintiff alleges that no gunshot residue testing was completed, no fingerprints were taken, no DNA testing was conducted, no ballistics analysis was conducted,[6] and no forensic analysis of the Cabin was performed.  (*Id.*)  Sheriff McGrath closed his investigation "just days" after the incident at the Cabin.  (*Id.* at ¶ 55.)  No arrests were made, or criminal charges brought.  (*Id.*) Rather, Garrett's cause of death was designated as an accidental self-inflicted gunshot wound.  (*Id.* at ¶ 55.)

Frustrated, the Garrett family began collecting information and evidence.[7]  (*Id.* at ¶ 57.)  The next year the ONG performed a review of Garrett's death as part of a larger inquiry into the military's concern of the influence of seditious local militant groups, the members of which are also state National Guardsmen.  (*Id.* at ¶ 58.)  The Garrett family was first advised on December 21, 2021, by Sergeant Mike Harris of the 174th AAD that the ONG would only begin investigating once the

---

[6] Plaintiff alleges that ONG Sergeant John Russell, while visiting the Cabin on October 21, 2021 to retrieve additional property of the soldiers, discovered a shell casing near the area of the shooting.  (*Id.* at ¶ 53.) He also observed what appeared to be a bullet strike in the wall behind the refrigerator.  (*Id.*) Sergeant Russell placed the casing in a bag and took a photo of the bullet-strike before delivering them to the MCSO. (*Id.*) On February 14, 2022, however, "Sheriff McGrath told the Garrett family that despite being provided the day after the shooting [with] a photograph of the location of the subject bullet, that evidence had subsequently 'disappeared.'" (*Id.* at ¶ 54.)

[7] Plaintiff alleges that the Garrett family's investigation included "a deep examination of Discord, a popular free messaging internet platform." (*Id.* at ¶ 57.)  "As a result of the disturbing, sadistic, racially offensive, misogynistic, and antisemitic posts of several of the Guardsmen Defendants on Discord that [the Garrett Family] had discovered and shared with law enforcement, Meade and Develin were arrested and charged with criminal offenses – unrelated to the death of Nathan Garrett." (*Id.* at ¶ 61.)  One of Develin's threatening acts was directed towards the MCSO because of their refusal to return his handguns now that the case was closed. (*Id.*)  Plaintiff alleges that: "Federal investigators thought enough of this and other threats (fly an airplane into the Columbus Budweiser Brewery Towers in the fashion of 9/11 and shooting up a Columbus Jewish Synagogue) to charge Develin with hate crimes. This member of the Ohio National Guard and fellow radar missile artillery soldier with the Guardsmen Defendants plead guilty and is currently incarcerated in Federal Prison." (*Id.* at ¶ 62.)

7

MCSO's file was closed – even though Sheriff McGrath had closed his inquiry two months earlier. (*Id.*) A month later, on January 14, 2022, Sergeant Harris told the family that a Lieutenant Snyder was assigned by the ONG as the investigating officer for the incident that led to Garrett's death. (*Id.*) Lieutenant Snyder was "uninterested in the information the family had uncovered" and "was never heard from thereafter." (*Id.*)

On April 5, 2022, ONG Lt. Colonel Bob Lytton spoke with Plaintiff Lisa Garrett. (*Id.* at ¶ 59.) Colonel Lytton informed Lisa Garrett that he had been assigned to investigate Lt. Snyder, who had been removed from the inquiry into the death of Nathan Garrett. (*Id.*) Colonel Lytton also revealed to the family for the first time that there were bodycam images from the MCSO of the October 20, 2021, incident that were a part of Lt. Snyder's file. (*Id.*) The Garrett family was shocked because they had previously requested all evidence "back in the fall of 2021," but were never provided with any bodycam footage, nor did the MCSO or the investigating Deputies suggest the existence of bodycam evidence. (*Id.*)

Plaintiff alleges that, "[a]s a consequence of the conscious wrongdoing of the MCSO, the ONG and the Guardsman Defendants (including Brenna Nye), Plaintiff has been denied the ability to identify the person(s) who is directly responsible for the shooting of Nathan Garrett and has been denied a legal remedy against such tortfeasors directly for the death of her son." (*Id.* at ¶ 64.)

## II.  Procedural History

Nearly two years later, on October 13, 2023, Plaintiff filed a Complaint in this Court against the following defendants: (1) the MCSO; (2) the Morgan County Board of County Commissioners; (3) Morgan County Sheriff McGrath; (4) Morgan County Deputy Mayle; (5) Morgan County Deputy Jenkins; (6) the ONG c/o Major General Harris; (7) ONG AAD First Sergeant Gillum; (8) ONG AAD

Captain Wilker; (9) ONG AAD Commanding Officer Bogan; (10) Guardsmen Defendants Allen, Van Liere, Develine, Meade, Leach, and Haas; (11) Brenna M. Nye; and (12) John Does Nos. 1 through 3.  (Doc. No. 1.)  Therein, Plaintiff alleged various state and federal claims arising out of Garrett's death on October 20, 2021.

In January 2024, Defendants Nye and Allen filed Answers and, later, Amended Answers. (Doc. Nos. 10, 11, 14, 17.)  Defendants Morgan County Sheriff's Office, Morgan County Board of County Commissioners, McGrath, Mayle, and Jenkins (hereinafter "the Morgan County Defendants") filed a Motion to Dismiss.  (Doc. No. 18.)  Defendants Allen, Meade, and Van Liere also filed separate Motions to Dismiss and/or for Judgment on the Pleadings.  (Doc. Nos. 12, 13, 15.)

At that time, however, Plaintiff had yet to perfect service on numerous Defendants, including the ONG Defendants, Defendant Develin, and Defendant Haas.  Thus, on February 21, 2024, the Court notified Plaintiff that "unless good cause is shown for failure to serve the above Defendants as provided under the Rules, the above Defendants will be dismissed without prejudice on March 6, 2024."  (Doc. No. 25.)

On March 6, 2024, Plaintiff filed a Motion for Leave to Amend Complaint, which was granted the same day.  (Doc. No. 44.)  The Amended Complaint asserts a total of ten state and federal claims against the same Defendants as in the original Complaint, including (among other things) seven claims against the ONG Defendants.[8]  (*Id*.)  Because the nature and factual bases of the claims against the ONG Defendants are important to the resolution of the specific service issue currently pending before the Court, the Court will discuss these claims in some detail.

---

[8] ONG Defendants Gillum, Wilker, and Bogan are sued both in their individual capacities and in their capacities as First Sergeant, Captain, and Commanding Officer, respectively, of the ONG AAD in McConnelsville.  (*Id*. at p. 2.)

9

In Count One, Plaintiff alleges a claim against the ONG Defendants under 42 U.S.C. § 1983 for denial of access.  (*Id.* at ¶¶ 65-77.)  Plaintiff claims that "[a]bsent Defendants' intentional concealment of the true evidence of the underlying crimes, Plaintiff would have a valid wrongful death claim for the death of Mr. Garrett against a primarily liable tortfeasor pursuant to Ohio Revised Code Section 2515.01 *et seq*."  (*Id.* at ¶ 66.)  Plaintiff alleges that "[i]Instead, at best, depending on what action the U.S. Attorney determines to consider [sic] any of the National Guard Defendants as federal employees under 32 U.S.C. § 502 and 28 U.S.C. §2671, Plaintiff may be limited to proceeding with only a premises liability action against one or two individual civilian parties."[9] (*Id.*)

Plaintiff goes on to allege that, "[a]s employees and officers of the State of Ohio, the ONG Defendants, in order to cover for the Guardsman Defendants, with the active assistance of the MCSO, McGrath, Jenkins and Mayle, intentionally obstructed the investigation into the death of Mr. Garrett by, inter alia, removing the Guardsman Defendants from the scene of the crime and later disposing of evidence (cleaning of the scene in the following days, failing to take any trace evidence samples from the Guardsman Defendants and letting them clean, sober-up and then report sanitized to the MCSO the following day)."  (*Id.* at ¶ 67.)  Plaintiff further claims that "[t]he misfeasance continued in the following months when despite overwhelming evidence that one or more soldiers were directly involved in criminal conduct, the ONG failed to take any timely steps to interrogate witnesses, collect and preserve evidence, and conduct any necessary scientific testing such as gunshot residue,

---

[9] Plaintiff then explains, in a footnote, as follows: "To counsel's knowledge there is no basis for a claim of federal jurisdiction over the Ohio National Guard in this case. When on duty, the soldiers were on extended basic training and not within the service, even temporary, of the United States. Nevertheless, any claims against soldiers, whether regular Army or National Guard, are routinely reviewed by the U.S. Attorney for FTCA determination. To that extent, all claims herein are brought against agencies and employees of the State of Ohio acting 'under color of State law.' In the event the U.S. Attorney takes the position that the ONG Defendants and Guardsman Defendants were engaged in the service of the United States, Plaintiff has delivered a Form 95 claim to the Department of the Army prior to the filing of the within action." (*Id.* at p. 20, fn 1.)

10

fingerprints, ballistics, blood splatter patterns before the evidence either became too old, unreliable, or just completely disappeared." (*Id*. at ¶ 68.)

Plaintiff alleges that "by reinstating most if not all of the Guardsmen Defendants who were not criminally charged by law enforcement agencies other than the MCSO, the ONG Defendants have ratified the criminal misconduct of those individuals." (*Id*. at ¶ 71.)  Plaintiff asserts that "[d]ue to the intentionally obstructive actions taken by the ONG Defendants under color of state law, the underlying wrongful death claim has been substantially prejudiced in a manner that cannot be remedied by a state court." (*Id*. at ¶ 73.)  Plaintiff alleges that this "serves to deny Plaintiff access to a state remedy in violation [of] their Due Process rights under the Fourteenth Amendment of the U.S. Constitution, the Equal Protection Clause under the same provision, the First Amendment, and the Privileges and Immunities Clause of Article IV." (*Id*.)

In Count Two, Plaintiff asserts a state law claim against the ONG Defendants for obstruction of justice in violation of Ohio Rev. Code § 2921.32.  (*Id*. at ¶¶ 78-84.)  In this Count, Plaintiff alleges that the ONG Defendants, with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another, did (1) destroy or conceal physical evidence of a crime or act and induce any person to withhold testimony or information; (2) communicate false information to the MCSO and ONG Defendants; and (3) prevent or obstruct any person, by means of force, intimidation, or deception, from performing any act to aid in the discovery, apprehension, or prosecution of any person.  (*Id*. at ¶¶ 79, 80, 81.)  Plaintiff alleges that the ONG Defendants' actions violate Ohio Rev. Code § 2921.32 (Obstruction of Justice) and were taken with malicious purpose, in bad faith, and in a wanton and reckless manner.  (*Id*. at ¶¶ 82, 83.)  Plaintiff asserts that she is entitled to damages pursuant to Ohio Rev. Code § 2307.60.  (*Id*. at ¶ 84.)

11

In Count Five, Plaintiff asserts a claim against the ONG Defendants and the Morgan County Defendants pursuant to 42 U.S.C. § 1983 for civil conspiracy.  (*Id*. at ¶¶ 100-104.)  Plaintiff alleges that the ONG Defendants and MCSO Defendants engaged "in a single plan with the conspiratorial objective to intentionally deprive Plaintiff access to the courts by intentionally and maliciously destroying evidence and obstructing the investigation into the death of Mr. Garrett." (*Id*. at ¶ 101.) Plaintiff further claims that "[t]he ONG Defendants and MCSO Defendants did commit overt acts in furtherance of their conspiracy by way of removing the Guardsman Defendants from the scene of the crime, allowing the Guardsman Defendants to be removed from the scene of the crime, destroying evidence by intentionally disposing of the bullet and shell casing, and intentionally failing to conduct an investigation into the death of Mr. Garrett." (*Id*. at ¶ 102.) Plaintiff alleges that the ONG Defendants' and MCSO Defendants' conspiracy injured her "by intentionally depriving her of a wrongful death suspect for the death of Mr. Garrett." (*Id*. at ¶ 103.)

In Count Seven, Plaintiff asserts a claim against the ONG Defendants, the Guardsmen Defendants, and Nye for using weapons while intoxicated in violation of Ohio Rev. Code § 2923.15. (*Id*. at ¶¶ 110-115.)  Plaintiff alleges that, at the time of Garrett's death, "the Guardsmen Defendants and Nye in their individual capacities, and Defendant Develin as agent of the ONG" were intoxicated and/or consumed sufficient alcohol to be impaired, and were handling firearms.  (*Id*. at ¶¶ 111, 112.) Plaintiff alleges that this conduct constitutes a violation of Ohio Rev. Code § 2923.15.  (*Id*. at ¶ 113.) Plaintiff further alleges as follows:

> The injurious wrongdoing of the Guardsmen Defendants in their individual capacities and Defendant Develin also as a supervisory agent for the ONG, creates vicarious liability for the ONG Defendants. Further, the ONG Defendants are also liable from a primary liability standpoint for knowing of the misconduct through the instances before Nathan Garrett was killed, actively participating in it through Sergeant Develin,

> and in ratifying the misconduct by retaining the Guardsman Defendants after learning
> of the drunken usage of the handgun "exercise."

(*Id*. at ¶ 114.)

In Count Eight, Plaintiff asserts a state law claim for civil conspiracy against all Defendants, including the ONG Defendants.  (*Id*. at ¶¶ 117-120.)  Plaintiff alleges that "[b]y destroying evidence, intentionally obstructing the investigation into the death of Mr. Garrett, and ratifying the misconduct of its agents/employees by the ONG Defendants, all Defendants maliciously conspired, expressly or tacitly, in pursuance of a common plan or design to injure Plaintiff by way of Obstructing Justice in violation of R.C. 2921.32."  (*Id*. at ¶ 118.)  Plaintiff claims that "[t]he conspiracy undertaken by the Defendants did cause injury to Plaintiff by way of depriving her of a primarily liable wrongful death tortfeasor for the death of Nathan Garrett."  (*Id*. at ¶ 119.)

In Count Nine, Plaintiff asserts a claim against the ONG Defendants for violation of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  (*Id*. at ¶¶ 121-129.)  Plaintiff alleges that the ONG "has performed at least one review that included some reference to the shooting death of Nathan Garrett."  (*Id*. at ¶ 122.)  The first and more comprehensive of these reviews was allegedly done "by Captain Matthew Jacobs, USA, which was initiated to look into potential infectious influence of radical seditious militia within the Ohio National Guard. Captain Jacob's review included the shooting death of Nathan Garrett."  (*Id*.)  Plaintiff claims that the second official review is what is called a "Loss on Duty" or ("LOD")  determination.  (*Id*. at ¶ 123.)  Pursuant to FOIA, 5 U.S.C. § 552, Plaintiff officially submitted requests for production of this information on May 10, 2022, February 19, 2023, and June 6, 2023.  (*Id*. at ¶¶ 124-126.)  *See also* Doc. Nos. 44-1 through 44-3.

Plaintiff alleges, upon information and belief, that "the report prepared by Captain Jacobs has been presented to the ONG Adjunct, Major General John C. Harris, who has not only presented it to

13

Governor Michael DeWine, but also presented it to a board of public officials including the Governor, the Attorney General and others."  (*Id*. at ¶ 127.) Plaintiff demands that the Court "order the immediate production of the unredacted Jacobs report – at the least (or at least those portions that deal with the shooting death of Nathan Garrett) – as well as the statements completed by the Guardsmen Defendants (and any of the ONG Defendants) on or around October 20-21, 2021." (*Id*. at ¶ 129.)  Plaintiff also requests that the Court impose a penalty upon the ONG pursuant to 5 U.S.C. § 552 *et seq*. of at $100 per day from June 10, 2022 through to the present and for every day into the future that the request remain outstanding and ignored." (*Id*.)

Finally, in Count Ten, Plaintiff asserts a claim against the ONG Defendants for Negligent Retention.  (*Id*. at ¶¶ 130-134.)  Plaintiff alleges that "[a]s the employer of Defendant Develin, ONG and the ONG Defendants are independently liable for the negligent retention, supervision and promotion of Develin because the ONG Defendants chose to employ and retain Develin who had a history of criminal, tortious or otherwise dangerous conduct about which the ONG Defendants knew and/or could have discovered through reasonable investigation."[10]  (*Id*. at ¶ 131.)  Plaintiff further alleges that "[a] special relationship also existed between the ONG Defendants and Nathan Garrett, who was an off-duty employee of the ONG at the time of his death." (*Id*. at ¶ 132.)  Plaintiff claims that "[s]ince the ONG Defendants knew of the dangerous firearm exercise performed by Develin, Meade and Leach, when drinking alcohol during off-duty socializing away from the [AAD], Defendants owed a duty to off duty employees like Garrett to prevent foreseeable injury by exercising

---

[10] Plaintiff alleges that "the evidence in support of this claim involves, inter alia¸ the ONG Defendants' knowledge of Develin's mental health condition(s), the treatment therefor, and the previous misconduct he, Meade and Leach carried out at the Cabin with the intoxicated handgun exercise where a firearm actually discharged into the floor on a prior occasion." (*Id*.)

reasonable care to refrain from continuing to employ incompetent employees like Develin." (*Id.*) Plaintiff alleges that, "[h]ad the ONG Defendants complied with their duty to employees like Garrett, Develin would never have been in the position to engage in the drunken shooting exercise/game and Nathan Garrett would be alive today." (*Id.* at ¶ 133.)

In light of the filing of the Amended Complaint, the Court denied all pending Motions to Dismiss as moot. Thereafter, Defendants Allen, Nye, Meade, and Haas filed Answers (Doc. Nos. 45, 52, 59, 63) and the Morgan County Defendants, Van Liere, Allen, and Haas each filed Motions to Dismiss and/or Motions for Judgment on the Pleadings (Doc. Nos. 54, 55, 57, 64, 70.) In addition, on March 5, 2024, Defendant Nye filed a Motion to Consolidate the instant case with *Garrett v. Allen, et al.,* Case No. 1:24cv00471 (N.D. Ohio) (Ruiz, J.), which had been removed to this Court by the United States from the Cuyahoga County Court of Common Pleas.[11] (Doc. No. 53.) Plaintiff filed a

---

[11] In *Garrett v. Allen, et al.*, Case No. 24cv471, the docket reflects that Plaintiff Lisa Garrett (individually and as administrator of the Estate of Nathan Garrett) filed a Complaint in the Cuyahoga County Court of Common Pleas on October 13, 2023 against Allen, Van Liere, Develin, Meade, Leach, Haas, Nye, and Meade's grandmother, Betty Jean Greene. This Complaint also arises out of the shooting death of Nathan Garrett, and alleges state law claims for premises liability, civil conspiracy, negligent handling/use/furnishing of a handgun; and violations of Ohio Rev. Code § 2923.15 (using weapons while intoxicated) and § 2921.32 (obstructing justice). While the case was pending in state court, Plaintiff subpoenaed the ONG for documents and information relating to Garrett's death. The Department of the Army responded, via letter from Assistant U.S. Attorney Ruchi Asher. In that letter, AUSA Asher stated (in relevant part) that "Department of Defense and Army regulations govern the disclosure of official Ohio National Guard information." AUSA Asher further indicated that Plaintiff's subpoena "does not comply with the relevant regulations" and, therefore, "the Ohio National Guard cannot evaluate your request or honor your subpoena at this time." Plaintiff thereafter filed a Motion to Compel. On March 11, 2024, the state court granted Plaintiff's Motion in part, and ordered the ONG to produce the requested records "or inform the Court the specific factors under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) and cited Army regulations that prevent disclosure of the records." Two days later, on March 13, 2024, the United States removed the action to the Northern District of Ohio, where it was randomly assigned to Judge David Ruiz. On June 12, 2024, Judge Ruiz issued an Order finding that removal was proper "only as to the Plaintiff's discovery requests to ONG and the state issued subpoena." Case No. 1:24cv471 (Doc. No. 24 at p. 4.) The Court explained that: "The issue of whether the subpoena issued by the state court is enforceable against the ONG is severed from the core of this action and remains before this Court. Further consideration of the subpoena before the Cuyahoga County Common Pleas Court remains stayed until further Order of this Court. In all other respects, the principal case is REMANDED forthwith to the Cuyahoga County Court of Common Pleas." (*Id.*) In a Joint Status Report filed June 13, 2024, Plaintiff's counsel indicated that he and AUSA Asher reached an accommodation in which the ONG agreed to turn over a redacted version of the Jacobs Report which is one of the issues subject to Plaintiffs' subpoena. (Doc. No. 26.) On June 5, 2024, the ONG produced to Plaintiffs a redacted copy of the Jacobs Report. (*Id.*) Following Plaintiffs' thorough review of the Jacobs

Brief in Opposition to the Motion to Consolidate on March 20, 2024.  (Doc. No. 58.)  The Motion to Consolidate remains pending at this time.

Meanwhile, on March 11, 2024, Plaintiff filed returns of service executed by express mail as to the ONG Defendants.  (Doc. Nos. 39, 41, 42, 48.)  The returns of service reflect that Summonses and copies of the Amended Complaint were sent to each of the ONG Defendants via express mail to the following address: "c/o Ohio National Guard, 2825 West Dublin Granville Road, Columbus, Ohio 43235."  (*Id.*)  Delivery was signed for by an individual named "William Sayles."  (*Id.*)

On March 22, 2024, the ONG Defendants filed a "Notice of Deficient Service." (Doc. No. 66.)  Therein, the ONG Defendants argue that "for the purposes of the allegations in the Complaint and Amended Complaint, these defendants are federal actors, and the Plaintiff is required to perfect service upon the United States of America under Fed. R. Civ. P. 4(i)."  (*Id.* at p. 2.)  Because Plaintiff has failed to do so, the ONG Defendants assert that the time for them to respond to the Amended Complaint "has not yet started to run."  (*Id.*)

On March 27, 2024, Plaintiff filed a Response in which she argues that "so far as the ONG Defendants are concerned, this case primarily concerns the violation of Plaintiffs' constitutional rights by individuals acting while employees of a department of the State of Ohio under *color of state law*." (Doc. No. 69 at p. 2) (emphasis in original).  Plaintiff maintains that "it is well settled under Ohio law that unless called to active (or special) duty by lawful order, National Guardsmen are agents of the State of Ohio for their regular activities."  (*Id.* at pp. 2-5.)  She asserts that, as the ONG

---

Report, on June 10, 2024, Plaintiffs again conferred with the ONG regarding obtaining certain exhibits to the Jacobs Report that were not produced.(*Id.*) According to a Status Report filed on July 8, 2024, the ONG authorized the release of certain exhibits to Plaintiff's counsel on July 5, 2024.  (Doc. No. 28.)

Defendants have not been called to active duty, they are state actors and have been properly served under Ohio law.  (*Id.*)

Shortly thereafter, on April 12, 2024, Plaintiff filed Applications for Entry of Default in the instant action as to each of the ONG Defendants.  (Doc. Nos. 72, 73, 74, 75.)  At the Court's direction, these Applications have not yet been entered by the Clerk of Court.  Rather, on April 15, 2024, the Court ordered additional and more thorough briefing on the issue of whether the ONG Defendants are federal actors for purposes of service.  (Doc. No. 79.)  The ONG Defendants thereafter submitted a Supplemental Brief on April 29, 2024.  (Doc. No. 87.)  Plaintiff filed a Response on May 13, 2024, to which the ONG Defendants replied on May 20, 2024.  (Doc. Nos. 90, 93.)

## III    Analysis

The ONG Defendants maintain that, for the purposes of the claims alleged in the Amended Complaint, they are federal actors who must be served in accordance with Rule 4(i) because: (1) Plaintiff's claims occurred while the ONG Defendants were participating in "inactive duty federal training" pursuant to 32 U.S.C. § 502(a); (2) Defendant Bogan was not only an ONG AAD battalion commander but was also employed full-time with the ONG as a "Dual Status Federal Technician" at all relevant times; (3) Plaintiff's claims "sound in tort" and therefore fall within the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671; and (4) the ONG is a federal "agency" for purposes of FOIA.  (Doc. Nos. 66, 87, 93.)

In response, Plaintiff maintains that "while there are times when a National Guard may be considered a part of the federal government when called to duty under lawful authority, there is no basis to conclude that in each and every legal action involving a National Guardsmen [] federal jurisdiction is implicated."  (Doc. No. 69 at p. 4.)  Plaintiff asserts that, under the circumstances

17

presented herein, the ONG Defendants should not be considered federal actors because there is no evidence that they were subject to a "clear and lawful order to federal service" for purposes of the allegations and claims in the Amended Complaint.  (Doc. No. 90 at p.3.)

Some background regarding the constitutional and statutory framework of the National Guard is necessary to put the parties' arguments in context.  The National Guard "plays a dual role, operating under joint federal and state control."  *In re Sealed Case*, 551 F.3d 1047, 1048 (D.C. Cir. 2009).  This "hybrid" status stems from the Militia Clause of the U.S. Constitution, which gives to Congress the authority "[t]o provide for organizing, arming and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States," but "reserve[es] to the States, respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."  U.S. Const., art I, § 8, cl. 16.  *See In re Sealed Case*, 551 F.3d at 1058; *Lipscomb v. Federal Labor Relations Authority*, 333 F.3d 611, 614 (5th Cir. 2003).  The Militia in this Clause is what is now known as the National Guard.  *See Gilligan v. Morgan*, 413 U.S. 1, 6 (1973); *In re Sealed Case*, 551 F.3d at 1048.

Each of the fifty states has its own National Guard unit which are known as the Army National Guard.  *In re Sealed Case*, 551 F.3d at 1048.  "Together, all federally recognized state [Army National Guard] units comprise one of the reserve components of the United States Army, known as the Army National Guard of the United States."[12]  *Id*.  "The Federal Government provides virtually all of the

---

[12] As the Supreme Court explained in *Perpich v. Dep't of Def.*, 496 U.S. 334, 351 (1990):  "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retained their status as members of a separate State Guard unit. *** [U]nder the 'dual enlistment' provisions of the statute that has been in effect since 1933, a member of the Guard who is ordered to active duty in the federal service is thereby relieved of his or her status in the State Guard for the entire period of federal service."  *Id*. at 345. The Supreme Court further noted that, "[i]n a sense, [members of a State Guard unit] now must keep three hats in

18

funding, the materiel, and the leadership for the State Guard units." *Perpich v. Dep't of Def.*, 496 U.S. 334, 351 (1990).  "Although states are responsible for training the Army National Guard and rely on their units under gubernatorial command 'to respond to local emergencies,' *Perpich*, 496 U.S. at 351, such training must conform to regulations prescribed by the Secretary of the Army, 32 U.S.C. §§ 501–505." *In re Sealed Case*, 551 F.3d at 1048.  Thus, "[t]he Militia Clause and the statutory scheme contemplate a shared responsibility for the National Guard, although the precise nature of that relationship is not always obvious." *Association of Civil Technicians, Inc. v. U.S.*, 603 F.3d 989, 992 (D.C. Cir. 2010).  Or, as the Fifth Circuit has observed, "in the modern-day federal scheme, the national guard … has become, by design, a 'hybrid' entity that carefully combines both federal and state characteristics, sometimes distinctly and sometimes not." *Lipscomb*, 333 F.3d at 614.

This dual federal-state status is intended to reflect a "reasoned balance between federal and state court control," under which "the daily operations of the national guard units are … recognized generally to be under the control of the states, but governed largely by substantive federal law." *Lipscomb*, 333 F.3d at 614.  *See also Association of Civil Technicians, Inc.*, 603 F.3d at 993-994. This dual status, however, can make the determination of whether a state National Guard or Guardsmen is acting in a state or federal capacity somewhat "murky."  *In re Sealed Case*, 551 F.3d at 1049 (quoting *Bowen v. United States,* 49 Fed. Cl. 673, 676 (2001) (noting the "murky and mystical duality of the National Guard system")).  As several federal courts have observed, "[a]lthough a state National Guard may have federal status for certain statutory purposes, *see, e.g., In re Sealed Case*, 551 F.3d at 1053; *Lipscomb*, 333 F.3d at 613, whether it has federal status 'necessarily turns on the

---

their closet – a civilian hat, a state militia hat, and an army hat – only one of which is worn at any particular time." *Id.* at 348.

particular [statutory] provision at issue in each case,' *In re Sealed Case*, 551 F.3d at 1053." *Association of Civil Technicians, Inc.*, 603 F.3d at 994.

    With the above principles in mind, the Court will address each of the ONG Defendants' arguments, separately, below.

### A.    Training Duty under 32 U.S.C. § 502(a)

    The ONG Defendants first argue that they are federal actors who must be served in accordance with Rule 4(i) because Plaintiff "asserts claims that occurred while" the ONG Defendants were participating in "inactive duty federal training" pursuant to 32 U.S.C. § 502(a).  (Doc. No. 87 at p. 5.)  In support of this assertion, the ONG Defendants submit Declarations from Defendants Wilker and Gillum, in which they each aver, in relevant part, that "[f]rom October 19 to October 24[,] 2021, I was …. performing federal training overseeing the unit's training activities in preparation for its upcoming deployment."  (Doc. Nos. 87-1 at ¶ 2; Doc. No. 87-2 at ¶ 2.) The ONG Defendants also submit the Declaration of Defendant Bogan in which he avers (in relevant part) that, during this time period, he was "battalion commander and next level commander" over Defendants Wilker and Gillum.  (Doc. No. 87-3 at ¶¶ 2, 4.)  The ONG Defendants thus assert that they are federal actors for purposes of the instant action because they were "carrying out federal training responsibilities at federal expense," and receiving federal benefits, pay, and allowances during the relevant time period. (Doc. No. 87 at p. 5.)

    Plaintiff insists that the fact that the ONG Defendants were engaged in a "training program created by federal regulation" is not sufficient, standing alone, to create a "federal agency connection" requiring service of process under Rule 4(i).  (Doc. No. 90 at p. 2-3.)  Rather, Plaintiff asserts, National Guardsmen are only considered to be acting in a federal capacity "where there is a clear and

lawful order to federal service." (*Id*. at p.3.)  Plaintiff maintains that the ONG Defendants have failed to come forward with any evidence of such a "clear and lawful order" here because the Declarations of Defendants Wilker, Gillum, and Bogan are superficial, conclusory, and self-serving, and fail to provide "any detail of specific federal orders or job duties other than those commonly within the scope of their activities with the ONG." (*Id*. at pp. 6, 10.)

Plaintiff also argues that, even if these Defendants had reported for "federal training" at the time of Garrett's death, the fact remains that "none of the claims in the [Amended] Complaint concern any training activities." (*Id*. at p. 9.)  Plaintiff states that "Nathan Garrett was not shot during marksmanship instruction or any sanctioned activity during duty hours at or near the McConnelsville base" but, rather, "was killed during an off-duty social engagement in a private cabin after hours." (*Id*. at pp. 9-10.)  In sum, Plaintiff argues that, while the ONG does "have a federal role and may receive federal funding," "the ONG Defendants can point to nothing specifically that says that the entire organization and its employees are exempt from the state of Ohio rules regarding service of process when called to extended basic training." (*Id*. at p. 10.)

The statutory scheme for the National Guard appears in Title 10 of the United States Code, which addresses the armed forces generally, as well as in Title 32, which addresses the National Guard specifically. *See Association of Civil Technicians, Inc.*, 603 F.3d at 992-993; *Stanford v. U.S.*, 992 F.Supp.2d 764, 777-778 (E.D. Ky. 2014) (Thapar, J.), *reconsidered in part on other grounds*, 2014 WL 2574492 (E.D. Ky. June 9, 2014).  "[W]hen the National Guard is called into federal active duty pursuant to Title 10, Guardsmen are completely stripped of their state status and become fully integrated into the United States military, subject to federal command." *Stanford*, 992 F.Supp.2d at 778. *See also Perpich*, 496 U.S. at 345; *Matreale v. New Jersey Dept. of Military & Veterans Affairs*,

487 F.3d 150, 156 (3rd Cir. 2007).  When Guardsmen serve in so-called "Title 32 status," however, Guardsmen can have dual federal-state status. *See Matreale*, 487 F.3d at 156; *Stanford*, 992 F.Supp.2d at 788; *U.S. ex rel. Conover v. Anthony*, 781 F.Supp.2d 257, 263 (D. Md. 2011).  For example, courts have noted that "[d]espite state control, state Guardsmen are federal employees for [Federal Tort Claims Act] purposes when they engage in service that generally corresponds to 'full-time National Guard duty.'" *Stanford*, 992 F.Supp.2d at 778.  Additionally, federal law provides that, for benefits purposes, "inactive-duty training performed by a member of the Army National Guard of the United States in his status as a member of the Army National Guard, in accordance with regulations prescribed under section 502 of title 32 … , *shall be considered inactive-duty training in Federal service as a Reserve of the Army*." 10 U.S.C. § 12602(a)(3) (emphasis added).

As noted above, here, the ONG Defendants argue that Defendants Wilker and Gillum are federal actors because they "were acting in their capacities as officers performing federal training duties under 32 U.S.C. § 502(a)."  (Doc. No. 66 at p.1.)  Section 502(a) requires Guardsmen to assemble for inactive duty training at least 48 times per year under regulations issued by the federal, not state government.  *See* 32 U.S.C. § 502(a).[13] The ONG Defendants argue that, because Wilker and Gillum were performing training that is prescribed (and paid for) by the United States under this statute (and Bogan was, at that time, supervising them as battalion commander), Defendants Wilker, Gillum, and Bogan were necessarily federal actors for purposes of the instant action.  Plaintiff, on the

---

[13] Specifically, Section 502(a) provides that: "(a) Under regulations to be prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, each company, battery, squadron, and detachment of the National Guard, unless excused by the Secretary concerned, shall— (1) assemble for drill and instruction, including indoor target practice, at least 48 times each year; and (2) participate in training at encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year." 32 U.S.C. § 502(a).

other hand, appears to assert that Defendants Wilker, Gillum, and Bogan can only be considered federal actors if they were called to active federal duty under Title 10.

For the following reasons, the Court rejects Plaintiff's argument.  As the ONG Defendants correctly note, federal courts have recognized that Guardsmen serving under orders issued pursuant to 32 U.S.C. § 502 may constitute federal actors.  For example, in *Matreale v. New Jersey Dept. of Military & Veterans Affairs*, 487 F.3d 150, 156 (3d Cir.2007), a member of the New Jersey Army National Guard attempted to bring a state law discrimination claim against the state agency overseeing his service.  The plaintiff argued that the intra-military immunity doctrine announced in *Feres v. United States*, 340 U.S. 135 (1950),[14] did not bar his claim because his injuries were not sustained in the course of active federal duty under Title 10, but rather in the course of training under 32 U.S.C. § 502. *Id*. at 154–55.  According to the plaintiff, this made him a state, rather than a federal, employee to whom the *Feres* doctrine did not extend.

The Third Circuit rejected this argument, explaining that the plaintiff was a federal employee, or at best a dual federal-state employee, because he was training under orders issued pursuant to federal law. The court explained:

> **Matreale's arguments in support of his position that his status as a Title 32 guardsman rendered him a state rather than a federal employee likewise are unpersuasive**. First, his reliance on *Perpich v. Department of Defense*, 496 U.S. 334, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990) is misplaced. There, the Supreme Court held that Congress may authorize that members of the National Guard be assigned to active federal duty for training outside the United States without either the consent of the state governor or the existence of a national emergency. The Court, in addressing the unique "dual enlistment" status of state National Guard members, observed that "[s]ince 1933 all persons who have enlisted in a State National Guard unit have

---

[14] In *Feres*, the Supreme Court held that "the Government is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id*. at 146. The doctrine developed primarily due to concerns about the "adverse impact on military discipline inherent in the judicial review of military orders," and has been expanded to bar a broad range of claims asserted by service members. *Matreale*, 487 F.3d at 154.

simultaneously enlisted in the National Guard of the United States." 496 U.S. at 345, 110 S.Ct. 2418. The Court held that under this dual enlistment system, "a member of the Guard who is ordered to active duty in the federal service is thereby relieved of his or her status in the State Guard for the entire period of federal service." *Id*. at 346, 110 S.Ct. 2418.

**Matreale misconstrues the *Perpich* holding as implying that unless a state guardsman has been called to active duty under Title 10 and thereby loses his status in the state guard, he at all other times remains solely in state, not federal, status. But the plain holding of the Court is to the contrary.** Under the holding in *Perpich*, Matreale attained dual status as a member of both the National Guard of the United States and the [New Jersey Army National Guard] when he accepted his commission as an officer. 32 U.S.C. §§ 305 and 307; N.J.S.A. 38A:7–4. And while under *Perpich* a state guardsman loses his state status when he is called to active duty under Title 10, there is nothing in *Perpich* from which one reasonably may infer, as Matreale argues, that a Title 32 guardsman "loses", or does not have, federal status unless he is mobilized under Title 10 or engaged in drills or field training under 32 U.S.C. § 502(a). On the contrary, the Supreme Court in *Perpich* stressed that its holding that a state guardsman is stripped of his state status when he is called to active duty under Title 10 "merely recognizes the supremacy of federal power in the area of military affairs." *Perpich*, 496 U.S. at 351, 110 S.Ct. at 2428. **Our conclusion that a state guardsman serving under orders issued pursuant to Title 32, whether serving under § 502(a) or § 502(f), has and retains his federal status, along with his state status, even when he has not been called to active duty under Title 10, likewise recognizes federal supremacy over military affairs.**

*Id*. at 156-157.

Likewise, in *U.S. ex rel. Conover v. Anthony*, 781 F.Supp.2d 257 (D. Md. 2011), the relator, Captain Robert Conover, was an officer with the Maryland Air National Guard employed as a dual status technician pursuant to 10 U.S.C. § 10216(a).  Relator brought a *qui tam* action under the False Claims Act ("FCA") alleging that present and former fighter pilots of the state air national guard had submitted false claims for payment to the United States for training missions which they did not complete.  *Id*. at 259.  Defendants moved to dismiss on the basis of the FCA's intramilitary immunity provision.  *Id*. at 260.  Relator contended that the intramilitary immunity provision did not extend to

members of the National Guard when they are not in active service of the United States.  *Id.*  The

district court rejected Relator's argument, finding:

> Even if the court assumes that a guardsman can only wear either his state militia hat
> or his army hat at one time, the statutory scheme governing the training of dually
> enlisted guardsmen supports the contention that the defendants were serving in the
> federal, not state, capacity when conducting their [Additional Flying Training
> Periods]. Section 501 of Title 32, which governs the training of state guardsmen,
> states: "The training of the National Guard shall be conducted by the several States,
> the Commonwealth of Puerto Rico, the District of Columbia, Guam, and the Virgin
> Islands in conformity with this title." 32 U.S.C. § 501(b). At the same time, however,
> § 502(a) requires guardsmen to assemble for inactive duty training at least 48 times
> each year under regulations issued by the federal, not state, government.  See 32
> U.S.C. § 502(a)(1).  Section 502(f) also allows the federal government to order
> guardsmen to perform training or duty in addition to that required under § 502(a). See
> 32 U.S.C. § 502(f). **Federal laws treat training completed by guardsmen under §
> 502 distinctly from training completed by guardsmen strictly in their state
> capacity**. For example, Title 10 provides that, for the purposes of providing benefits
> to guardsmen, "inactive-duty training performed by a member of the Air National
> Guard of the United States in his status as a member of the Air National Guard, in
> accordance with regulations prescribed under section 502 of title 32 or other express
> provisions, shall be considered inactive-duty training in Federal service as a Reserve
> of the Air Force." 10 U.S.C. § 12602(b)(3) (emphasis added). The Federal Tort Claims
> Act ("FTCA") also defines federal employees to encompass "members of the National
> Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505
> of title 32." 28 U.S.C. § 2671. **The foregoing provisions of the statutory scheme
> governing the National Guard support the contention that guardsmen training
> pursuant to § 502 serve in their federal, rather than state, capacities.**

*Id.* at 262-263 (emphasis added) (internal footnotes omitted).  *See also Hoffman v. Stump*, 172 F.3d

48 (Table), 1998 WL 869972 at *1 (6th Cir. 1998) (noting that appellant was "on federal National

Guard duty pursuant to 32 U.S.C. § 502(f) … at the time of the incident that gave rise to his claim");

*Cordry-Martinez v. Oregon Army National Guard*, 2017 WL 4778591 at *2 (D. Or. Oct. 20, 2017)

(finding that guardsmen were "in federal service" when operating under orders pursuant to 32 U.S.C.

§ 502(f)); *Fanslau v. 177th Fighter Wing of the Air National Guard of the State of New Jersey*, 2006

WL 1798653 at * 4 (D. N.J. June 28, 2006) ("Guardsmen serving on orders pursuant to § 502 are considered federal employees for the purposes of the FTCA") (citing 28 U.S.C. § 2671).

Plaintiff's arguments to the contrary are without merit. While Plaintiff directs this Court's attention to a number of state and federal cases in which National Guardsmen have been found to be acting in a state capacity, these cases are distinguishable from the instant action because they do not involve tort claims against National Guardsmen performing training under 32 U.S.C. § 502. Rather, the cases cited by Plaintiff largely consist of actions filed by or on behalf of national guardsmen regarding the denial of various benefits (such as workers compensation, tuition reimbursement, back pay, etc.) or asserting claims of wrongful termination. *See, e.g., Sorrentino v. Ohio Nat. Guard*, 53 Ohio St.3d 214, 218-219 (1990) (breach of contract action by guardsmen seeking tuition reimbursement); *State ex rel. North Olmsted Fire Fighters Ass'n v. City of North Olmsted*, 64 Ohio St.3d 530 (1992) (mandamus action by guardsmen seeking credit for vacation leave for his prior service in the Ohio National Guard); *Farrier v. Connor*, 12 Ohio St.3d 219, 221-222 (1984) (action by widow of guardsman for state workers compensation death benefits); *Gnagy v. United States*, 634 F.2d 574, 579 (Ct. Cl. 1980) (action by national guardsman seeking back pay); *Christoffersen v. United States*, 230 Ct. Cl. 998, 1001-1004 (Ct. Cl. 1982) (action by national guardsman seeking reinstatement, back pay, allowances, benefits and other benefits arising out of his alleged wrongful termination).[15]

---

[15] The Court also finds Plaintiff's reliance on *Scheuer v. Rhodes*, 416 U.S. 232 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984), to be misplaced. In that case, the personal representatives of three students who died during a period of civil disorder on the campus of Kent State University ("KSU") in May 1970 filed an action in federal court against (among others) the Governor of Ohio, the Adjutant General, and various members of the Ohio National Guard. *Id*. at 234. The plaintiffs asserted claims under 42 U.S.C. § 1983 for allegedly illegal actions on the part of the ONG while deployed on the campus of KSU which resulted in the death of the plaintiffs' decedents. *Id*. at 234-235. Plaintiffs alleged that the defendants' actions were taken under color of state law. The district court dismissed the complaint on the grounds that the plaintiffs' claims were effectively against the State of Ohio and, therefore, barred by

Accordingly, the Court agrees with the ONG Defendants that, if Defendants Wilker, Gillum, and Bogan were, in fact, serving under orders issued pursuant to 32 U.S.C. § 502(a) at all times relevant to the Amended Complaint, they could be considered federal actors, at least with respect to some of Plaintiff's claims. The Court has several concerns, however, that the ONG Defendants fail to address.

First, the Declarations submitted by Defendants Wilker, Gillum, and/or Bogan fail to either identify the statutory basis of their "federal training" or attach and authenticate copies of the orders under which they were acting between October 19, 2021 and October 24, 2021. *See* Doc. Nos. 87-1, 87-2, 87-3. Rather, the only express reference to 32 U.S.C. § 502(a) appears in the ONG Defendants' briefing, which is not evidence. Moreover, neither the ONG Defendants' briefing nor the Declarations of Defendants Wilker, Gillum, and/or Bogan otherwise provide any further factual detail regarding the nature or scope of their "federal training" or the specific orders under which they were operating. *Id*. Thus, the entire factual underpinning of the ONG Defendants' argument is not well supported, which is surprising given the ample opportunity this Court provided to the ONG Defendants to prepare and submit their supplemental briefing.

Second, even assuming that Defendants Wilker, Gillum, and Bogan were directly participating in or supervising federal training under orders issued pursuant to § 502(a), the

---

the Eleventh Amendment. *Id*. The Sixth Circuit affirmed. *Id*. The Supreme Court reversed, finding that the Eleventh Amendment does not, in some circumstances, bar an action for damages against a state official charged with depriving a person of a federal right under color of state law.  In *Scheuer,* however, there is no indication that the defendant Guardsmen were engaged in training or otherwise operating under orders issued pursuant to 32 U.S.C. § 502.  Moreover, the parties in *Scheuer* did not dispute that the defendant Guardsmen were acting under color of state law and, thus, the Supreme Court did not directly address or consider whether those defendants were acting in a federal or state capacity. Lastly, the Court notes that *Scheuer* was decided prior to the 1981 amendments to the FTCA, which (as discussed in more detail *infra*) expressly amended the definition of "employee of the government"  to include members of the National Guard when engaged in training or duty under 32 U.S.C. § 502.

Declarations provided by Defendants Wilker and Gillum state only that they were performing federal training between October 19, 2021 and October 24, 2021.  *Id.*  However,  Plaintiff's claims (and the factual allegations supporting them) extend well beyond this six (6) day period.  Plaintiff's denial of access claim against the ONG Defendants, for example, involves not only the ONG Defendants' allegedly inadequate investigation on October 20 and 21, 2021, but also their alleged inadequate investigation during the many weeks and months that followed.  Specifically, in Count One, Plaintiff expressly alleges that the ONG Defendants' "misfeasance *continued in the following months* when …. the ONG failed to take any timely steps to interrogate witnesses, collect and preserve evidence, and conduct any necessary scientific testing such as gunshot residue, fingerprints, ballistics, blood splatter patterns before the evidence either became too old, unreliable, or just completely disappeared" (Doc. No. 44 at ¶ 68) (emphasis added).  Moreover, in support of this claim, Plaintiff alleges that the ONG Defendants ratified the criminal misconduct of the Guardsmen Defendants by reinstating most of them when they were not criminally charged, which, presumably, occurred after October 24, 2021.  (*Id.* at ¶ 71.)  Plaintiff's federal and state conspiracy charges (Counts Five and Eight) can likewise be reasonably interpreted as including actions by the ONG Defendants (allegedly in concert with the Morgan County Defendants) that occurred, at least in part, after October 24, 2021. (*Id.* at ¶¶ 100-104, 117-120.)

Lastly, in her negligent retention claim (Count Ten), Plaintiff alleges that the ONG Defendants are liable for retaining, supervising, and promoting Defendant Develin, despite his "history of criminal, tortious or otherwise dangerous conduct about which the ONG Defendants knew and/or could have discovered through reasonable investigation."  (*Id.* at ¶ 131.)  Although the time period covered by this claim is not expressly alleged, it can reasonably be assumed that it

encompasses acts or omissions allegedly occurring prior to October 19, 2021, the alleged first day of "federal training" mentioned in Defendant Wilker's and Gillum's Declarations.

The ONG Defendants fail to acknowledge or address the issue of whether they should be considered federal actors with respect to claims which are based on alleged conduct that relates to an incident that occurred during "federal training" (i.e., Mr. Garrett's death) but which occurred (at least in part) outside the time period under which they were acting under orders issued pursuant to § 502(a). Nor do the ONG Defendants acknowledge or address the fact that there is authority supporting the position that, at a minimum, Plaintiff's negligent retention claim may implicate the ONG Defendants' conduct in their state capacities, as personnel decisions regarding state Guardsmen are often found to be reserved to the states. *See, e.g., Schultz v. Wellman*, 717 F.2d 301, 304 (6th Cir. 1983) ("Federal law provides that the authority to discharge enlisted personnel from the National Guard rests with the state.") (citing 32 U.S.C. App. § 2201.18(b)); *Sorrentino*, 53 Ohio St.3d at 219 ("The federal government has left the administration of National Guard personnel to the states").

Nonetheless, it is important to consider the context in which this issue has arisen – i.e., service. In order for this action to proceed against the ONG Defendants, this Court must ensure that they have been properly served. As the Sixth Circuit has noted, the requirement of proper service of process "is not some mindless technicality." *Friedman v. Estate of Presser,* 929 F.2d 1151, 1156 (6th Cir. 1991). *See also Federal Trade Commission v. Repair All PC, LLC*, 2017 WL 2362946 at * 2 (N.D. Ohio May 31, 2017). Rather, service of a summons and complaint "must meet constitutional due process and the requirements of the federal rules in order for jurisdiction to exist over a defendant." *Federal Trade Commission*, 2017 WL 2362946 at * 2.

While the Court has concerns regarding the sparse record before it at this time regarding the federal vs. state status of the ONG Defendants, the Court must ensure that it has jurisdiction over the ONG Defendants via proper service of the summons and Amended Complaint before proceeding further.  For the following reasons, the Court finds, based on the limited record before it, that the ONG Defendants have come forward with sufficient evidence, at this time, to warrant at least a preliminary finding that Defendants Wilker, Gillum, and Bogan were acting in their federal capacities with respect to some of Plaintiff's claims by virtue of the fact they were engaged in inactive duty federal training under 32 U.S.C. § 502(a).

Although lacking in meaningful detail, Defendants Wilker and Gillum do aver, under penalty of perjury, that they were performing "federal training overseeing the unit's training activities in preparation for its upcoming deployment" during the time period between October 19 to October 24, 2021.  (Doc. Nos. 87-1, 87-2.)  Defendant Bogan avers (among other things) that, during this same time period, he was "a battalion commander and next level commander over Captain Wilker and First Sergeant Gillum."  (Doc. No. 87-3.)  In their briefing before this Court, the United States Attorney's Office (as counsel for the ONG Defendants) has represented that the "federal training" referenced in Wilker's and Gillum's Declarations was pursuant to 32 U.S.C. § 502(a).  (Doc. No. 87 at p. 3.)  Taken together, the Court finds that this is sufficient, at this stage and for purposes of this Opinion only, to demonstrate that ONG Defendants Wilker, Gillum, and Bogan were performing inactive duty training under 32 U.S.C.  § 502(a).

As such, and based on the legal authority discussed above, the Court further finds that the ONG Defendants were acting in a federal capacity while engaging in training pursuant to §502(a).  *See Matreale*, 487 F.3d at 156; *U.S. ex rel. Conover*, 781 F.Supp.2d 257; *Hoffman*,1998 WL 869972

30

at * 1; *Cordry-Martinez*, 2017 WL 4778591 at * 2; *Fanslau*, 2006 WL 1798653 at * 4. This conclusion is also consistent with, and supported by, the undisputed fact that at least some of Plaintiff's claims are tort claims. As noted *supra*, the FTCA[16] expressly defines "employee of the government" to include "members of the National Guard while engaged in training or duty under section …. 502 … of title 32." 28 U.S.C. § 2671. *See also Allen v. Dejacimo*, 1987 WL 5465 at * 3 (Ohio App. 8th Dist. Jan. 15, 1987) (noting that the FTCA was amended in 1981 to redefine federal employees to include members of the National Guard while engaged in training or duty under 32 U.S.C. § 502 and finding that "[t]hus, the United States is liable for negligent acts by a national guard member engaged in training or duty pursuant to" that section.)

In light of the above, the Court finds, for purposes of this Opinion only, that ONG Defendants Wilker, Gillum, and Bogan were acting in their federal capacities with respect to Plaintiff's tort claims by virtue of the fact they were engaged in inactive duty federal training under 32 U.S.C. § 502(a). Thus, the Court finds that Plaintiff is required to serve ONG Defendants Wilker, Gillum, and Bogan under Fed. R. Civ. P. 4(i). Plaintiffs must do so by no later than ninety (90) days of the date of this Order. The Court further directs the Clerk's Office not to enter the Applications for Entry of Default against the ONG Defendants, which were filed by Plaintiff on April 12, 2024. (Doc. Nos. 72-75.)

**B.    Defendant Bogan's Status as a "Dual Status Technician" under 32 U.S.C. § 709**

---

[16] "When a federal employee commits a tort while acting within the scope of his employment, any private remedy for that tort must be sought against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680." *Rector v. United States*, 243 Fed. Appx. 976, 978 (6th Cir. 2007).

In his Declaration, Defendant Bogan also avers (in relevant part) that "[a]t all times during the period in question, I was in the employ of the United States and was functioning in my dual status as a federal technician GS employee and as the military battalion commander with responsibility over CPT Wilker's battery." (Doc. No. 87-3 at ¶ 4.)   The Court has already preliminarily determined, *supra,* that Defendant Bogan was acting in a federal capacity in his role as battalion commander and next-level commander over Defendants Wilker and Gillum during the federal training period that occurred between October 19 and 24, 2021 pursuant to 32 U.S.C. § 502(a).  The ONG Defendants argue that Defendant Bogan should be also deemed a federal actor for purposes of the instant action for the additional reason that he was acting as a dual status technician under 32 U.S.C. § 709.  (Doc. No. 66 at pp. 1-2; Doc. No. 93 at pp. 7-8.)  Citing the Supreme Court's decisions in *Ohio Adjutant General's Dep't v. FLRA*, 598 U.S. 449 (2023) and *Babcock v. Kijakazi*, 595 U.S. 77 (2022), the ONG Defendants assert that, as a matter of law, dual status technicians "are, at all times, federal actors."  (Doc. No. 93 at p. 8.)

Plaintiff disagrees, asserting that dual status technicians "serve **simultaneously** as members of a state national guard and as civil employees." (Doc. No. 90 at p. 12) (emphasis in original).  Plaintiff argues that 32 U.S.C. § 709 "recognizes numerous occasions that a dual status technician is acting as an employee of the State National Guard" and maintains that "it is clear from the statutory framework of the Act and the interpreting case law that Defendant Bogan should be deemed a State of Ohio employee for this matter."  (*Id*. at p. 13.)

Dual status technicians working for the State National Guards are a "unique category of federal civil-service employees." *Ohio Adjutant General's Dep't,* 598 U.S. at 453.  As the Supreme Court explained:

These "rare bird[s]" occupy both civilian and military roles. *Babcock v. Kijakazi*, 595 U. S. ——, ——, 142 S.Ct. 641, 644, 11 L.Ed.2d 424 (2022). They serve as "civilian employee[s]" engaged in "organizing, administering, instructing," "training," or "maintenance and repair of supplies" to assist the National Guard. 10 U.S.C. § 10216(a)(1)(C); *see* 32 U.S.C. §§ 709(a)(1)–(2); *Babcock*, 595 U. S., at ——, 142 S.Ct., at 644. Yet, they must "as a condition of that employment ... maintain membership in the [National Guard]" and wear a uniform while working. 10 U.S.C. § 10216(a)(1)(B); *see* 32 U.S.C. §§ 709(b)(2)–(4). **Except when participating as National Guard members in part-time drills, training, or active-duty deployment, see 32 U.S.C. §§ 502(a) and 709(g)(2), dual-status technicians work full time in a civilian capacity and receive federal civil-service pay**. *See Babcock*, 595 U. S., at —— – ——, 142 S.Ct., at 644-645; *see also* 5 U.S.C. § 2101(a).

**Importantly, under the Technicians Act of 1968, each dual-status technician is considered "an employee of the Department of the Army or the Department of the Air Force, as the case may be, and an employee of the United States**." 32 U.S.C. § 709(e). While it is state adjutants general who "employ and administer" dual-status technicians working for their respective State National Guard units, they can only do so pursuant to an express "designat[ion]" of authority by the Secretary of the Army or the Secretary of the Air Force. § 709(d) [citation omitted].

*Id*. at 453-454 (emphasis added). *See also Babcock*, 595 U.S. at 80-81; *Federal Labor Relations Authority v Michigan Army National Guard*, 878 F.3d 171, 174 (6th Cir. 2017) (noting that "[u]nder federal law, dual-status technicians occupy a 'hybrid military-civilian position'" and are "afforded the benefits and rights generally provided for federal employees in the civil service") (quoting *Fisher v. Peters*, 249 F.3d 433, 438 (6th Cir. 2001) and *N.J. Air Nat'l Guard v. FLRA*, 677 F.2d 276, 279 (3rd Cir. 1982)).

Based on the limited record before it, the Court preliminarily finds that, whether Defendant Bogan is considered in his supervisory role as battalion commander during the federal training period occurring between October 19 and 24, 2021 or in his role as dual status technician under 32 U.S.C. § 709, the ONG Defendants have come forward with sufficient evidence, at this time, to show that Defendant Bogan was acting in a federal capacity for purposes of at least some of Plaintiff's claims. As set forth *supra*, to the extent Defendant Bogan was performing, supervising, or otherwise

33

participating in federal training in his role as a battalion commander between October 19 and 24, 2021 pursuant to 32 U.S.C. § 502(a), the Court preliminarily finds that he was acting in a federal capacity for purposes of Plaintiff's tort claims against the ONG Defendants. To the extent discovery reveals that Defendant Bogan was instead functioning as a federal technician pursuant to 32 U.S.C. § 709 during this time period, the Court preliminarily finds (again, based on the limited record before it) that he was likewise acting in a federal capacity pursuant to 32 U.S.C. § 709(e).

Section 709(e) expressly provides, in relevant part, that "[a] technician employed under subsection (a)[17] is an **employee of the Department of the Army** or the Department of the Air Force, as the case may be, **and an employee of the United States**." 32 U.S.C. § 709(e) (emphasis added). Moreover, courts have recognized that dual status technicians are "afforded the benefits and rights generally provided for federal employees in the civil service." *Michigan Army National Guard*, 878 F.3d at 174 (citation omitted).  Given this authority, and Defendant Bogan's representation in his Declaration that he was functioning in his dual status as a federal technician "at all times during the period in question," the Court preliminarily finds, and for purposes of the instant Opinion only, that Defendant Bogan was acting in a federal capacity to the extent he was performing his role as a dual status technician under 32 U.S.C. § 709 during the time period relevant to the Amended Complaint. Accordingly, the Court finds that Plaintiff is required to serve Defendant Bogan under Fed. R. Civ. P. 4(i) for this additional reason as well.

---

[17] Section 709(a) provides, in relevant part, that: "(a) Under regulations prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, and subject to subsections (b) and (c), persons may be employed as technicians in-- (1) the organizing, administering, instructing, or training of the National Guard; (2) the maintenance and repair of supplies issued to the National Guard or the armed forces; and (3) the performance of the following additional duties to the extent that the performance of those duties does not interfere with the performance of the duties described by paragraphs (1) and (2): (A) Support of operations or missions undertaken by the technician's unit at the request of the President or the Secretary of Defense. (B) Support of Federal training operations or Federal training missions assigned in whole or in part to the technician's unit. ***" 32 U.S.C. § 709(a).

**C.      Whether the ONG is a "Federal Agency" for purposes of Plaintiff's FOIA claim**

Lastly, the ONG Defendants argue that the ONG is a federal agency under FOIA, 5 U.S.C. §

552, even when it is not activated for federal duty.  (Doc. No. 87 at pp. 6-7; Doc. No. 93 at p. 7.)  The

ONG Defendants maintain that the ONG is, therefore, a federal actor for purposes of Plaintiff's FOIA

claim and must be served in accordance with Rule 4(i).  (*Id.*)  Plaintiff does not acknowledge or

address the ONG Defendants' argument the ONG is a federal actor for purposes of FOIA.  (Doc. No.

90.)

As noted above, in Count Nine, Plaintiff asserts a claim against the ONG for violation of the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 in connection with the ONG's failure to

produce records relating to its review of the shooting death of Mr. Garrett, despite Plaintiffs' repeated

requests.  (Doc. No. 44 at ¶¶ 121-129.)  FOIA sets forth statutory requirements for the production of

certain information by federal "agencies."  Section 552(f)(1) of FOIA defines the term "agency" as

follows:

> (f) For purposes of this section, the term—
>
> (1) "agency" as defined in section 551(1) of this title includes any executive
> department, **military department**, Government corporation, Government controlled
> corporation, or other establishment in the executive branch of the Government
> (including the Executive Office of the President), or any independent regulatory
> agency

5 U.S.C. 552(f)(1) (emphasis added).  Courts interpreting this language have concluded that FOIA's

definition of the term "agency" extends to federally recognized National Guard units at all times.  *See*

*In re Sealed Case*, 551 F.3d at 1049 (construing definition of "agency" in the Privacy Act, 5 U.S.C.

552a, which adopts the FOIA's definition of agency" and finding that "[a]s long as the Secretary has

not withdrawn the Vermont Army National Guard's federal recognition, it is part of an agency …

whether or not federally activated"); *Citizens for Responsibility and Ethics in Washington vs. U.S. Dep't of the Army*, 2023 WL 3995639 at * 2 (D.D.C. June 14, 2023) (finding that the South Dakota National Guard and its adjutant general are subject to FOIA).

In light of the above, and given Plaintiff's lack of opposition, the Court agrees that Defendant ONG is a federal agency for purposes of Plaintiff's FOIA claim under 5 U.S.C. § 552.  Accordingly, the Court finds that Plaintiff is required to serve Defendant ONG in accordance with Fed. R. Civ. P. 4(i).  Plaintiffs must do so by no later than ninety (90) days of the date of this Order.

## IV.    Conclusion

Accordingly, the Court finds, based on the limited record before it and for purposes of this Opinion only, that the ONG Defendants are federal actors with respect to at least some of Plaintiff's claims and, therefore, must be served in accordance with Fed. R. Civ. P. 4(i).  Plaintiff is ordered to serve the ONG Defendants in accordance with Fed. R. Civ. P. 4(i) by no later than 90 days from the date of this Order.

**IT IS SO ORDERED.**

Dated:  July 10, 2024                    *s/Pamela A. Barker*
                                          PAMELA A. BARKER
                                          UNITED STATES DISTRICT JUDGE

36